Argued April 25, affirmed October 16, reconsideration denied December 5, 1978, petition for review denied January 23, 1979, 285 Or 73

STATE OF OREGON, *Respondent,*
*v.*
CLYDE EPPS, *Appellant.*
(No. C 77-05-07062, CA 9138)

STATE OF OREGON, *Respondent,*
*v.*
DON AZEVEDO, *Appellant.*
(No. C 77-05-07063, CA 9222)
(Cases Consolidated)
585 P2d 425

David F. Cargo and Michael E. Haglund, Portland, argued the cause for appellants. On the brief was David F. Cargo, Portland.

Donald L. Paillette, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James A. Redden, Attorney General, Al J. Laue, Solicitor General, and Kathleen G. Dahlin, Certified Law Student, Salem.

Jerard S. Weigler, Michael E. Haglund, and Lindsay, Nahstoll, Hart, Neil & Weigler, Portland, filed a brief amicus curiae for appellants.

TANZER, J.

## TANZER, J.

Defendants appeal from their convictions of kidnapping in the second degree. They are agents of a California surety company, Cowboy Bail Bonds, which entered into a bail agreement with one Morrow to effectuate his release from incarceration in Bakersfield, California. In violation of the terms of the agreement, Morrow then left California without the consent of either the surety or the court and took up residence in Portland, Oregon. In 1977, he was pursued and captured by defendants in Portland and returned to the custody of the court in California. It is that taking which is the basis of the present kidnapping conviction.

Kidnapping in the second degree is defined by ORS 163.225(1)(a), which provides:

"A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, he:

"(a) Takes the person from one place to another * * *."

Defendants admit they took the victim from one place to another. Defendants contend that the taking was not "without consent or legal authority."

## I. "WITHOUT CONSENT"

First, the defendants assert that the taking was not "without consent." ORS 163.215(1) defines that term for purposes of the kidnapping statutes:

" 'Without consent' means that the taking or confinement is accomplished by force, threat or deception * * *."

There is evidence that defendant Azevedo burst into a room where the victim, Morrow, was employed. Azevedo demanded to know whether Morrow was Steven Morrow. When Morrow asked Azevedo why he wanted to know, Azevedo grabbed Morrow's arm and insisted that Morrow identify himself. Morrow denied

[ 521 ]

that he was Steven Morrow. Defendant Epps then entered the office and pushed Morrow against a partition. During the struggle, Morrow shouted to his supervisor to call the police and he did so.

Morrow broke loose. He ran out of the office and down the street. Azevedo pursued Morrow on foot while Epps chased him in a pickup truck. Defendants eventually cornered Morrow. They pulled Morrow's hands behind his back and handcuffed him. Defendants then pushed Morrow into their pickup and started driving toward California. After about an hour and a half, Morrow complained that it hurt his shoulder to have his hands cuffed behind his back. Defendants took the handcuffs off of Morrow, placed his hands in front of him and put the handcuffs back on. Defendants also placed leg-irons around Morrow's ankles. Morrow was not allowed during the 18-hour ride to stop or make any phone calls. At no time did Morrow consent to being handcuffed or restrained or to accompanying defendants back to California. Defendants took Morrow to the Kern County Jail. The recited evidence is sufficient to establish, in the words of the statute, "that the taking or confinement [was] accomplished by force."

■ Defendants contend that Morrow had given his consent to be taken into custody if he failed to notify the bondsman of a change of address or employment by having signed a bond agreement which included a provision to that effect. Whatever legal effect such a contractual provision might have, it does not constitute consent as that term is used in the statutory definition which, as it applies to this case, is based solely upon the use of force in the taking.

## II. "WITHOUT * * * LEGAL AUTHORITY"

### A. The Applicable Statute

■■ The defendants next contend that the taking was legally authorized. Obviously, with "legal authority" means authorized by law. The warrantless arrest in

Oregon by a private person of a person accused of a crime in another state is authorized and regulated by ORS 133.805 of the Uniform Criminal Extradition Act.[1] That section provides:

> "The arrest of a person may be lawfully made also by an officer or a private citizen without a warrant, upon reasonable information that the accused stands charged in the courts of another state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in ORS 133.803; and thereafter his answer shall be heard as if he had been arrested on a warrant."

Under this statute, the defendants were legally authorized to arrest Morrow and take him before a judge or magistrate with all practicable speed for legal proceedings to determine if Morrow was in fact the person wanted and if the charge against him was extraditable. The acts of the defendants in taking Morrow straightaway to California were not authorized by the statute which controls the legal authority to arrest a person wanted in another state. Therefore, the "legally authorized" exception to the kidnapping statute provides no excuse for defendants' conduct.

## B. The Defendants' Theory

Acknowledging that there is no statute authorizing the private arrest of a person wanted in another state, the defendants contend, and our dissenting colleagues seem to agree, that legal authority for the kidnapping exists by virtue of common law doctrine which is still valid in Oregon. Their contention is based upon the leading case of *Taylor v. Taintor,* 83 US (16 Wall) 366, 371, 21 L Ed 287 (1872) (decided, in historical terms, a short time after the more celebrated case of *Dred Scott v. Sandford,* 60 US (19 How) 393, 15 L Ed 691 (1856),

---

[1] The dissent states that the taking was not authorized by ORS 133.803, but makes no mention of ORS 133.805.

with which the latter opinion shares some common philosophy, notwithstanding the intervening conflict) stating the common law doctrine that a bail bondsman has absolute dominion over his principal:

"When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner. * * *"[2]

The defendants contend that Oregon adopted the common law rule in 1864 by enactment of a statute which, in its most recent form, former ORS 140.420, provided:

"For the purpose of surrendering the defendant, the bail, at any time before the forfeiture of their undertaking and at any place within the state, may themselves arrest him or, by a written authority indorsed on a certified copy of the undertaking, may empower any other person so to do."

We see nothing in the words of former ORS 140.420 which authorizes transport out of the state for surrender and it has never been so construed. Even if we accept defendant's contention that the statute was intended to codify the common law rule in all its particulars, however, common law rules are not immutable. The common law rule which defendant relies is inconsistent with contemporary requirements of civility. The undesirable workings of the rule enunciated in *Taylor v. Taintor* are summarized in a

---

[2]It is true that this passage from *Taylor v. Taintor,* 83 US (16 Wall) 366, 21 L Ed 287 (1872), was quoted in *State v. Broom,* 121 Or 202, 209, 253 P 1042, 253 P 1044 (1927), as noted in the dissent, but it was not a decisional issue. It is unlikely that the common law rule was ever enunciated in Oregon.

generative work of the modern bail revision movement, R. Goldfarb, Ransom 117-18 (1965):

> "These powers would be far-reaching and abusable enough in the hands of proper and responsible police authorities. The same powers in the hands of bondsmen is shocking and frightening. The bondsman is subject to less controls and is possessed of greater powers than is the law enforcement officer who would exercise counterpart functions. Hence he can act as a de facto state agent without being subject to the usual safeguards ordinarily surrounding the conduct of those officials.
>
> "When a defendant who is free on bail flees from the jurisdiction of the court under whose control he is, no matter how metaphysically, the bondsman may pursue, arrest, and return the truant. The bondsman's powers conflict with the traditional safeguards that protect all criminally accused during the process of extradition. He can arrest and return a defendant in a summary manner beyond the powers of peace officers who must follow the procedures of extradition. And yet he is acting as part of the administration of the official criminal law apparatus of the state when he is doing this." (Footnote omitted.)

If ever the common law rule existed in Oregon, it is no more. In 1973, as a part of a comprehensive revision of the code of criminal procedure, the legislature repealed the entire statutory scheme regulating the traditional bail system in Oregon and enacted in its place a security release system eliminating reliance upon the extraordinary powers of bail bondsmen. At least three observations relevant to that legislative action are significant here: (1) There was a complete abandonment, not a reform, of the bail system; (2) ORS 140.420 was repealed; and (3) as a part of the criminal procedure revision, the Uniform Criminal Extradition Act, including what is now ORS 133.805, was re-enacted with some conforming amendments.

From this, the defendants would have us conclude as a matter of statutory construction that the repeal of a statute codifying a common law rule is not an abandonment of the common law principle and that *Taylor v. Taintor* still lives. We conclude to the

contrary. The legislative action was intended to eliminate the bail system and its attendant evils in favor of a more civilized system of apprehension and return of accused and convicted criminals. The common law rule is abandoned in favor of ORS 133.805 which provides judicial notice and identification safeguards which are more consistent with contemporary standards of due process.[3]

■ Because the defendants took the victim forcefully from one place to another without legal authority, the conviction must be upheld.

Affirmed.

**BUTTLER, J.,** dissenting.

The majority would have us believe that this court, rather than the legislative assembly, determines what conduct is subject to criminal sanctions, and that we are the repository in which society's concepts of justice and decency are stored only to be broken out when "contemporary requirements of civility" 36 Or App at 524 call upon us to exercise our grace. If I thought we had such authority to apply natural law concepts in determining what acts constitute a crime today, although they did not yesterday, I would agree with the majority. But I entertain no such thoughts, and therefore I respectfully dissent.

Defendants appeal from their convictions of kidnapping in the second degree. The issue is whether out-of-state bail bondsmen have "legal authority" within the meaning of ORS 163.225[1] to apprehend

---

[3]California has also outlawed the common law powers of bondsmen and requires more stringent due process protections than are afforded in Oregon by ORS 133.805. California Penal Code, § 847.5; *see, Ouzts v. Maryland National Insurance Co.,* 505 F2d 547, 552-53 (9th Cir 1974), *cert den* 421 US 949 (1975).

[1]ORS 163.225 provides:

"(1) A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, he:

their principal in Oregon without resort to legal process and surrender him to authorities in the original state. The majority opinion seems to say that foreign bondsmen never had such authority, but the state makes no such contention because it is clearly wrong; the only contention is that the foreign bondsmen's authority dissipated with the repeal of ORS chapter 140 in 1973. As I point out below, the repealed chapter was not applicable to foreign bondsmen, so its repeal could not make their conduct criminal, and the majority's attempt to make it so because defendants' behavior offends our sense of decency and civility presents a serious due process question under the Fourteenth Amendment to the United States Constitution.

The institution of bail dates back to pre-Norman England. *See* Note, *Bail: An Ancient Practice Reexamined,* 70 Yale L J 966 (1961). Under the early common law, a bondsman not only exposed his own property to loss if the principal failed to appear, but in some instances was subjected to the same punishment that would have been inflicted upon the prisoner. 2 F. Pollock & F. Maitland, The History of English Law 589-90 (2d ed 1898 & reissue 1968). In light of this exposure, the common law recognized the bondsman's right to pursue and recapture his principal without resorting to legal process.

This rule was recognized in this country, and was stated as follows in the leading case of *Taylor v. Taintor,* 83 US (16 Wall) 366, 371, 21 L Ed 287 (1872):

"(a) Takes the person from one place to another; or
"(b) Secretly confines the person in a place where he is not likely to be found.
"(2) It is a defense to a prosecution under subsection (1) of this section if:
"(a) The person taken or confined is under 16 years of age; and
"(b) The defendant is a relative of that person; and
"(c) His sole purpose is to assume control of that person.
"(3) Kidnapping in the second degree is a Class B felony."

"When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner. * * *"

Most of the states, including Oregon, followed the common law rule. Oregon codified it as early as 1864, and in its most recent form, former ORS 140.420 provided:

"For the purpose of surrendering the defendant, the bail, at any time before the forfeiture of their undertaking and at any place within the state, may themselves arrest him or, by a written authority indorsed on a certified copy of the undertaking, may empower any other person so to do."[2]

In 1935, the Oregon Attorney General expressed the opinion that a California bondsman was authorized to arrest his principal in Oregon and return him to California without resort to legal process, relying on the common law rule and the Oregon statute, noting that California law authorized such a bail bond with those attendant rights. 17 Op Att'y Gen 523-24 (Or 1934-36). Judicial recognition of the common law in Oregon appears in *State v. Broom,* 121 Or 202, 209, 253 P 1042, 253 P 1044 (1927), quoting *Taylor v. Taintor, supra.*

While there is no dispute with respect to the bail's rights at common law, or under ORS chapter 140 (particularly ORS 140.420) codifying the common law, the state contends that when the legislature enacted an entirely new pre-trial release procedure (ORS

---

[2]There is no evidence or contention that the bondsmen had forfeited their undertaking.

135.230-135.290) in 1973 (Oregon Laws 1973, ch 836), and as a part thereof repealed essentially all of ORS chapter 140, thereby abolishing the private party bail bondsman, foreign bondsmen were deprived of their right to arrest their principal without legal process if he happened to be in Oregon. The contention is that the sole remedy available to foreign bondsmen is now under the Uniform Criminal Extradition Act (ORS 133.743 to 133.857), and particularly, with respect to arresting their principal in Oregon, under ORS 133.803.

I do not agree with either contention. There was nothing in ORS chapter 140 which indicated that it applied to foreign bondsmen. It encompassed, like its 1973 successor (Oregon Laws 1973, ch 836), a pre-trial release procedure for persons charged with a crime in Oregon. Foreign bondsmen's rights were governed by the well-recognized common law rules set forth in *Taylor v. Taintor, supra,* and recognized by the Oregon Supreme Court in *State v. Broom, supra,* and by this court in *Umatilla County v. Resolute Ins. Co.,* 8 Or App 318, 493 P2d 731, *rev den* (1972).[3] The Attorney General had so held as long ago as 1935, and the legislature took no action to abrogate the common law as so applied. Those were the ground rules prior to 1973, and the question is whether the repeal of ORS chapter 140 changed them such as to make defendants' conduct criminal.

I cannot understand how the repeal of ORS chapter 140 had any effect on foreign bondsmen, who were not covered by its provisions. But even if ORS chapter 140, or ORS 140.420 in particular, may be said to have been applicable to foreign bondsmen, there is nothing to indicate that the legislature intended to make criminal that which had previously not been criminal by repealing the chapter. Absent an express statement of

[3] As we stated in our opinion in that case, we do not necessarily accept the common law rule as expressed in *Taylor v. Taintor,* 83 US (16 Wall) 366, 371, 21 L Ed 287 (1872), in its entirety.

legislative intent with respect to foreign bondsmen, we are relegated to general rules of statutory construction. The general rule applicable to the repeal of a statute which codifies the common law is stated in 2A Sands, Statutes and Statutory Construction 268, § 50.01 (4th ed 1973):

> "* * * The legislature is presumed to know the common law before the statute was enacted, and so the repeal of a statute, even though declaratory of it, revives the common law as it was before the statute."

*See also Makin v. Mack,* 336 A2d 230, 234 (Del Ch 1975).

Thus, the Oregon Tax Court has held:

> "* * * When, as in the field of taxation, the legislature merely supplants the common law procedure with a statutory one arriving at substantially the same remedial result, the common law is only in abeyance and then only to the extent that the statutory procedure actually takes its place. [Citation omitted.]" *Woodburn v. Domogalla,* 1 OTR 292, 348 (1963).

It does not appear that the legislature contemplated the situation we have at bar. The fact that ORS 140.420 was repealed along with the repeal of ORS chapter 140 as part of a complete revision of pre-trial release procedures applicable to persons charged with crimes in this jurisdiction, does not evidence an intention that foreign bail bondsmen are to be accorded less rights than they enjoyed prior to the revision. Nor am I persuaded that Oregon adopted "a complete code covering the subject,"[4] because there is nothing to indicate that the legislature intended to foreclose remedies theretofore available to sureties from other jurisdictions where the traditional bail system is still in use. The legislature did not address, nor does the new statutory scheme cover, the rights of, or remedies available to, bondsmen, domestic or

---

[4] *In re Estate of Moore,* 190 Or 63, 71, 223 P2d 393 (1950). *See also* 1A Sands, Statutes and Statutory Construction 277, § 23.31 (4th ed 1975).

foreign.[5] Under the statutory scheme now in effect, ORS 135.230 *et seq.,* there is no necessity for domestic bail bondsmen,[6] hence no necessity for the legislature to address the remedies available to them.

The state's contention that the extradition procedures are the only ones available to foreign bondsmen overlooks the fact that those procedures were available prior to the repeal of ORS chapter 140, and prior to the Attorney General's 1935 opinion, yet the state does not contend that foreign bondsmen were required to go through extradition procedures prior to the repeal of ORS chapter 140 in 1973.

---

[5]Some states have dealt expressly with the rights and remedies of foreign bondsmen, thereby abrogating the common law. *See, e.g.,* Cal Penal Code, § 847.5, which provides:

"If a person has been admitted to bail in another state, escapes bail, and is present in this State, the bail bondsman or other person who is bail for such fugitive, may file with a magistrate in the county where the fugitive is present an affidavit stating the name and whereabouts of the fugitive, the offense with which the alleged fugitive was charged or of which he was convicted, the time and place of same, and the particulars in which the fugitive has violated the terms of his bail, and may request the issuance of a warrant for arrest of the fugitive, and the issuance, after hearing, of an order authorizing the affiant to return the fugitive to the jurisdiction from which he escaped bail. The magistrate may require such additional evidence under oath as he deems necessary to decide the issue. If he concludes that there is probable cause for believing that the person alleged to be a fugitive is such, he may issue a warrant for his arrest. The magistrate shall notify the district attorney of such action and shall direct him to investigate the case and determine the facts of the matter. When the fugitive is brought before him pursuant to the warrant, the magistrate shall set a time and place for hearing, and shall advise the fugitive of his right to counsel and to produce evidence at the hearing. He may admit the fugitive to bail pending the hearing. The district attorney shall appear at the hearing. If, after hearing, the magistrate is satisfied from the evidence that the person is a fugitive he may issue an order authorizing affiant to return the fugitive to the jurisdiction from which he escaped bail.

"A bondsman or other person who is bail for a fugitive admitted to bail in another state who takes the fugitive into custody, except pursuant to an order issued under this section, is guilty of a misdemeanor."

*Construed in Ouzts v. Maryland National Insurance Co.,* 505 F2d 547, 552-53 n 4 (9th Cir 1974), *cert den* 421 US 949 (1975).

[6] *See Burton v. Tomlinson,* 19 Or App 247, 527 P2d 123, *rev den* (1974).

If the conclusion I have reached seems anomalous, the remedy is with the legislative assembly. I cannot say that the revision of pre-trial release procedures with respect to persons charged with crime in Oregon evidences such an overriding public policy against the exercise of age-old rights of foreign bondsmen to take custody of their principal without legal process as to make the exercise of those rights criminal. This conclusion is buttressed, if not dictated, by the legislature's failure to repeal similar rights of bondsmen under the provisions for bail in connection with civil arrest (ORS 29.520 to 29.740), which contain language almost identical to that contained in former ORS 140.420. *See* ORS 29.630.[7]

Moreover, the application of the kidnapping statute (ORS 163.225) to these defendants after the repeal of ORS chapter 140 in 1973, presents due process problems under the Fourteenth Amendment to the United States Constitution because defendants did not have fair notice that the law, as to them, had changed. *Palmer v. Euclid,* 402 US 544, 546, 91 S Ct 1563, 29 L Ed 2d 98 (1971). In that case, the United States Supreme Court stated:

> "* * * 'The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' United States v. Harriss, [347 US 612, 74 S Ct 808, 98 L Ed 989 (1954)], at 617, 98 L Ed at 996; Bouie v. Columbia, 378 US 347, 12 L Ed 2d 894, 84 S Ct 1697 (1964); Wright v. Georgia, 373 US 284, 10 L Ed 2d 349, 83 S Ct 1240 (1963)."

---

[7] ORS 29.630 provides:

"For the purpose of surrendering the defendant, the bail at any time and place, before they are finally charged, may themselves arrest him, or by a written authority, indorsed on a certified copy of the undertaking, may empower the sheriff or any other person of suitable age and discretion to do so."

I am unaware of any cases involving this section; I note, however, that these provisions have not gone unnoticed by the legislature; it amended ORS 29.620 in 1977. (Oregon Laws 1977, ch 415, § 6.)

Certainly, if defendants could have done what they did before the repeal of ORS chapter 140, they could not reasonably have understood that the repeal of that chapter, which did not apply to them, made their conduct criminal.

I would hold that defendants, as foreign bondsmen, had "legal authority" to take their principal into custody in Oregon for the purpose of returning him to California in accordance with the terms of the Bail Agreement which was valid under the law of California.[8] Accordingly, their doing so did not constitute the crime of kidnapping in the second degree as defined in ORS 163.225.

Thornton and Lee, JJ., join in this dissent.

---

[8] Cal Penal Code, § 1301.