734 P.2d 778

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Alberto LOPEZ and Thomas K. Colson,
Defendants-Appellants.**

**Nos. 9083, 9084.**

Court of Appeals of New Mexico.

Sept. 9, 1986.

Certiorari Quashed March 17, 1987.

Paul G. Bardacke, Atty. Gen., Carol J. Vigil, Sp. Ass't Atty. Gen., Santa Fe, for plaintiff-appellee.

David A. Baca, Timothy M. Padilla, Albuquerque, for defendants-appellants.

## OPINION

DONNELLY, Judge.

The appeals of co-defendants Alberto Lopez and Thomas K. Colson arise out of efforts of Lopez, a Texas bail bondsman, and Colson, his employee, to arrest and forcefully return to Texas authorities a person to whom Lopez had issued a surety bond. As a result of this incident, Lopez was convicted of aggravated assault on a peace officer, attempted aggravated burglary, and aggravated assault; Colson was convicted of attempted aggravated burglary and aggravated assault. The jury found that defendants committed each of the charges with a firearm. The two appeals have been consolidated.

We discuss: (1) the authority of a bail bondsman to arrest a bonded defendant; (2) denial of defendants' motions for mistrial; (3) comment on defendants' failure to testify; (4) claim of prosecutorial misconduct; (5) refusal to disqualify prosecutor and exclusion of evidence; and (6) defendants' claim of cumulative error. We affirm as to defendant Lopez and reverse as to defendant Colson.

The charges against defendants stem from a complicated scenario. In November 1984, Rudy Ojinaga was arrested in El Paso, Texas, and charged with possession of marijuana (a felony) and driving while intoxicated. A bail bond company operated by Lopez, secured the release of Ojinaga by posting a $9,500 surety bond. Following his release, Ojinaga left Texas and resided at the home of his parents in Grant County, New Mexico. In March 1985, Lopez was informed that Ojinaga had failed to comply with the conditions of his release on bond and that he had been terminated from a pretrial diversion program. In response, Lopez filed a motion in El Paso County Court, requesting that he be permitted to surrender Ojinaga to the custody of the court and be relieved of the bond. Thereafter, the Texas Court issued a bench warrant, directed to "any peace officer of the State of Texas," for the arrest of Ojinaga.

In May 1985, Lopez directed George Sandoval, an employee, to go to Central, New Mexico, and return Ojinaga to Texas authorities. In Central, Sandoval contacted Ojinaga's parents, seeking their assistance in returning their son to El Paso. The parents refused to relinquish their son or permit him to be returned to Texas and phoned Daniel Garcia, a Grant County undersheriff. Upon the deputy's arrival, Sandoval showed him the Texas bench warrant and informed him that he had been directed by the defendant Lopez to return Ojinaga to El Paso authorities.

Garcia testified that he was suspicious of Sandoval's authority because Sandoval was not a Texas peace officer and the bench warrant had several apparent erasures. Sandoval explained to Garcia that he was a

"bounty hunter" with Texas Fugitive Apprehension. Texas Fugitive Apprehension was a private company owned by Lopez. Garcia told Sandoval to return after the Memorial Day holiday with a valid bench warrant and that he would assist in Ojinaga's arrest. Sandoval then returned to El Paso.

Early the next morning, Lopez, Colson and Sandoval and two other men, without notifying New Mexico authorities, went to the home of Ojinaga's parents, where Ojinaga was staying. Lopez issued firearms to three of the men and armed himself. Lopez positioned the men around the residence and then knocked on the front door. Ojinaga's father answered the door. Lopez identified himself and informed him that he had come to take his son into custody for return to Texas. The father told Lopez he would not surrender his son. Lopez advised the father that they would forcibly enter the house if the son did not surrender voluntarily. The father locked the door, and Ojinaga's mother phoned the sheriff.

Lopez then instructed Colson to break the door down so they could enter the house. Pursuant to Lopez's direction, Colson kicked the door in. Both Lopez and Colson were armed. The father barred the entry to the house and brandished a knife. Hernandez, who had accompanied Lopez, pointed a rifle at the father and told him to drop the knife or he would shoot. Lopez then observed several other persons inside the house and instructed his men not to enter the house.

At this point, Garcia, dressed in civilian clothes, arrived at the house, where he was met by Lopez, Colson and two other armed men. Lopez disarmed Garcia. Lopez testified that he did not know that Garcia was a deputy sheriff because Garcia was neither wearing a badge nor driving a marked vehicle. Garcia testified that he had a badge pinned to his sport coat. Garcia persuaded Lopez to permit him to enter the house and bring out Ojinaga. Upon entering the house, Garcia phoned the sheriff's department and requested further assistance. Both the sheriff's department and the State Police responded.

Deputy Carl Henderson testified that when he arrived at the Ojinaga residence, Lopez was carrying a shotgun. Lopez put the gun down and approached Henderson, who was in a marked sheriff's vehicle and wearing a jumpsuit without insignia. Henderson testified that he identified himself as a deputy sheriff. Lopez then returned to where his shotgun was and picked it up. Henderson drew his revolver and told Lopez to leave the gun alone. Lopez disregarded Henderson's order and told him to leave the area "or we will shoot." Henderson then drove away from the residence. Lopez denied threatening to shoot Henderson or knowing that Henderson was a deputy sheriff.

Thereafter, other officers arrived at the scene and arrested Lopez, Colson, Sandoval and two other accomplices.

## I. BONDSMAN'S AUTHORITY TO ARREST

Defendants argue that the trial court erred in refusing to grant their motion to dismiss and their motions for a directed verdict. Defendants claim that they had both a legal and contractual right to arrest their bonded principal and forcibly return him to judicial authorities in Texas; hence, their actions were not criminal. Defendants also contend that they were lawfully armed and authorized to use reasonable force, and that the sheriff's deputies who intervened to prevent the arrest were not acting lawfully. In advancing this argument, defendants assert that the trial court erred in denying their requested instructions relating to their authority to arrest and in excluding certain exhibits referring to their good faith in reliance on their authority to act as bondsmen. We find no error in the rulings of which defendants complain.

Defendants rely upon *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 371, 21 L.Ed. 287 (1872), which provides in applicable part:

> When bail is given, the [bonded] principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment * * * they may seize him and deliver him

up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose.

At common law, a defendant released on bond was still under court control and in the custody of his bondsman. To be discharged from the obligation of its bail bond, the surety could surrender the principal to the control from which he had been released on bail. The bondsman was invested with authority to arrest the principal without warrant and redeliver him to the custody of the court to exonerate the bond. *See generally Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); *Taylor v. Taintor; Reese v. United States,* 76 U.S. (9 Wall. 13) 13, 19 L.Ed. 541 (1869). *See also* Annot., 3 A.L.R. 180 (1919); 73 A.L.R. 1369 (1931). Under common law, and in the absence of a statute providing otherwise, no new process is necessary for the arrest of a principal by his surety. *See Taylor v. Taintor; Crain v. State,* 66 Okla.Crim. 228, 90 P.2d 954 (1939).

In New Mexico, the powers of a bondsman are regulated by statute under the Bail Bondsmen Licensing Law, NMSA 1978, Sections 59A–51–1 to –19 (Orig.Pamp. 1984). By separate statute, a bondsman is empowered to arrest his principal. NMSA 1978, Section 31–3–4(B) (Repl.Pamp.1984), provides: "When a paid surety desires to be discharged from the obligation of its bond, it may arrest the accused and deliver him to the sheriff of the county in which the action against the accused is pending." *Compare State v. United Bonding Insurance Co.,* 81 N.M. 154, 464 P.2d 884 (1970). Alternatively, a bondsman may petition a judge or magistrate [in this state] for the issuance of an arrest warrant for the apprehension of an individual alleged to have violated the terms of his bail. *See* NMSA 1978, § 31–4–13 (Repl.Pamp.1984). Under this statute, the accused may be arrested to await requisition for extradition. The arresting officer is directed to bring the accused before the court to answer the complaint and show cause why he should not be subject to extradition to another state. *Id.*

■ Assuming but not deciding that the common law has been codified in Section 31–3–4(B), that does not support defendants' arguments on appeal. We are persuaded that the common law authority of the bondsman to transport a principal out-of-state, without the principal's consent, has been modified by enactment of the Uniform Criminal Extradition Act. NMSA 1978, §§ 31–4–1 to –30 (Repl.Pamp.1984). Under Section 31–4–15, a bondsman may not, without consent of the principal, remove him from this state without compliance with the provisions of the Uniform Criminal Extradition Act. The purpose of this statute is to provide an orderly means of extradition, and to accord procedural due process to persons sought to be removed without consent from this state. *Compare State v. Epps,* 36 Or.App. 519, 585 P.2d 425 (1978) (en banc).

In *State v. Epps,* the court considered a case factually analogous to the present cause and found that the common law authority of a bondsman had been modified by enactment of the Uniform Criminal Extradition Act. In *Epps,* agents of a California bonding company entered Oregon to return their principal to the custody of California officials. After forcibly seizing and removing a bonded individual from the state, the agents were charged and convicted of kidnapping in Oregon. Defendants argued that they had a common law right as bondsmen to forcibly arrest their surety and deliver him to California authorities. The court held that the common law right advocated by the defendants had been modified by statute, and that a bondsman seeking to remove a bonded principal from the state must follow the Oregon extradition statute. The court reasoned:

[T]he legislative action [enactment of the Uniform Extradition Act] was intended to eliminate the bail system and its attendant evils in favor of a more civilized system of apprehension and return of

accused and convicted criminals. The common law rule is abandoned in favor of [the extradition statute] which provides judicial notice and identification safeguards which are more consistent with contemporary standards of due process.

■ This same result is applicable under New Mexico law. A bondsman, while empowered by statute with the authority to arrest his principal under Section 31–4–14, is not immunized from liability for violations of this state's criminal laws perpetrated against third parties or the property of others while carrying out such arrest.

In conjunction with defendants' contention that the trial court erred in refusing to recognize their common law authority as bondsmen to arrest a bonded principal and to use reasonable force in effecting such arrest, defendants submitted four instructions which were refused by the trial court. It was not error for the trial court to refuse defendants' instructions Nos. 1, 2, 3A and 5. Defendants' requested instructions relying on the common law authority of a bondsman, or his agents, to take Rudy Ojinaga into custody were not correct statements of the law. Section 31–4–14 provides in part:

The arrest of a person may be lawfully made * * * by any peace officer or a private person without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, *but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath* * * *. [Emphasis added.]

■ The authority of a private bondsman or his agents to arrest a bonded principal without a warrant, is qualified by the statutory requirement that the individual arrested must be promptly taken before a judge or magistrate in this state, to be held pursuant to the Uniform Criminal Extradition Act. Sections 31–4–1 to –31. Defendants' requested instruction No. 1 referred, in part, to the authority of defendants to

enter New Mexico and *"to return Rudi Ojinaga to the custody of the El Paso Police Department,"* (emphasis added) but omitted the statutory requirement that the arrested individual must be taken promptly before a court of appropriate jurisdiction in this state. Moreover, in view of this state's constitutional provision against unreasonable searches and seizures, neither the common law nor statutory authority of a bondsman to make a warrantless arrest of his principal absolves a defendant of criminal responsibility ensuing from the armed, unauthorized, and forcible entry into the residence of a third party. *See* N.M. Const. art. II, § 10.

■ An instruction is properly refused if it is an incorrect statement of the law. *See generally State v. Lujan,* 94 N.M. 232, 608 P.2d 1114 (1980), *overruled on other grounds, Sells v. State,* 98 N.M. 786, 653 P.2d 162 (1982); *State v. Turner,* 97 N.M. 575, 642 P.2d 178 (Ct.App.1981). To preserve error defendants must submit a correct instruction on the law. *See State v. Casteneda,* 97 N.M. 670, 642 P.2d 1129 (Ct.App.1982). Defendants also tendered a proposed instruction on the use of reasonable force. This instruction was also rejected. The definition of "reasonable force" was only applicable if defendants' requested instruction No. 1 was given. It was not error to refuse these instructions.

Defendants also contend that the trial court erred in excluding three documentary exhibits consisting of publications referring to the common law right of a bail bondsman to arrest his principal. The trial court sustained the objection of the state to the admission of these exhibits. However, the court permitted Lopez to identify the exhibits and to testify that he had relied upon the documents, believing that he had a right to arrest Rudy Ojinaga.

The trial court did not err in excluding these exhibits. The exhibits constituted an incorrect statement of New Mexico law, insofar as they referred to the right of a bondsman to arrest a principal and forcibly remove him from this state without prior opportunity for a court hearing. *See* §§ 31–4–13 to –15. It is not error to ex-

clude evidence where its probative value is outweighed by the danger of confusion of the issues or misleading of the jury. *See* NMSA 1978, Evid.R. 403 (Repl.Pamp.1983).

■ Defendants further assert that the evidence at trial was insufficient to sustain their convictions of aggravated assault on a peace officer because they acted in self-defense and were unaware that Garcia and Henderson were sheriff's deputies. Additionally, they argue the state failed to prove that they made an unlawful entry into the Ojinaga residence with intent to commit a felony therein. The record rebuts these contentions. The statutory right of a bondsman or his agents to arrest a principal does not empower defendants, without lawful process, to effect an armed entry into the home of a third party (Ojinaga's parents), and to assault one or more of the occupants therein. The rationale discussed in *State v. Epps* is persuasive here.

The trial court's denial of defendants' motions to dismiss the indictment for a directed verdict of acquittal and rejection of defendants' requested exhibits and jury instructions was not error.

## II. DENIAL OF MISTRIAL

(A) Prior to trial, defendants filed a motion in limine seeking to prohibit the rifles and shotguns allegedly used by defendants from being introduced into evidence.

After the beginning of trial, but prior to the hearing of defendants' motion, the prosecutor carried the weapons into the courtroom. Defendants immediately moved for a mistrial, contending that the probative value of these items was substantially outweighed by the risk of prejudice to the defendants. The trial court denied the motion for mistrial.

■ We find no error in the denial of a mistrial resulting from the introduction of the weapons. Testimony regarding the presence of the weapons was introduced by both sides. Defendant Lopez admitted during his testimony that he had issued the weapons to his employees. The introduction of the weapons was relevant to the charges against defendants. *See* NMSA 1978, Evid.R. 401 (Repl.Pamp.1983). A weapon found in the possession of an accused or his associate is admissible as part of the history of the offenses charged. *See State v. Samora*, 83 N.M. 222, 490 P.2d 480 (Ct.App.1971); *see also State v. Smith*, 92 N.M. 533, 591 P.2d 664 (1979).

■ The admission or exclusion of evidence is within the trial court's discretion, and its determination will not be disturbed absent a clear abuse of discretion. *State v. McGhee*, 103 N.M. 100, 703 P.2d 877 (1985). The fact that relevant or otherwise competent evidence may tend to prejudice a defendant is not grounds for its exclusion. *State v. Hogervorst*, 90 N.M. 580, 566 P.2d 828 (Ct.App.), *cert. denied*, 90 N.M. 636, 567 P.2d 485 (1977).

■ Defendants also argue that the prosecutor acted improperly by pointing the weapons erratically around the courtroom and cocking the shotgun during his questioning of a witness. The prosecutor prefaced this act by informing a witness that he was doing so to show the weapon was not loaded. No objection was voiced at trial to the manner in which the exhibits were handled at trial. To preserve a claim of error for appellate review involving the admissibility of evidence, a party must make a timely objection. *State v. Aguilar*, 98 N.M. 510, 650 P.2d 32 (Ct.App.), *cert. denied*, 98 N.M. 478, 649 P.2d 1391 (1982). The claim of error was not preserved.

## III. COMMENT ON FAILURE TO TESTIFY

■ at the close of defendants' case, the trial court inquired of the state whether it desired to present rebuttal testimony. In the presence and hearing of the jury, the prosecutor responded:

Yes sir, we intend to have two rebuttal witnesses. Um. *Having been told that Mr. Colson was going to take the stand* ... its going to take me about * * *. [Emphasis added.]

Defendant Colson objected to the statement, and each of the defendants moved for a mistrial. They contended that the remark constituted an improper, direct

comment on Colson's failure to testify and prejudiced the defendants. This motion was denied by the trial court.

The state, although acknowledging that the remark was improper, argues that the statement was inadvertent and was prompted by a conversation with defense counsel, during a recess, that defense counsel planned to have Colson testify. Defendants admit having previously informed the prosecutor that they planned to have Colson testify but note that they reconsidered this decision.

We agree that the comment was prejudicial. Comment by a prosecutor on the accused's silence is violative of a defendant's constitutional rights under the fifth and fourteenth amendments. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *see Gonzales v. State,* 94 N.M. 495, 612 P.2d 1306 (1980). In *Gonzales v. State,* the court noted, citing *State v. Frank,* 92 N.M. 456, 589 P.2d 1047 (1979), that "whatever the prosecutor's intentions might have been and even if spoken with the purest of motives, if in fact the comments related to the failure of the defendant to testify, they were prejudicial and required that the conviction be set aside." *Id.* at 496, 612 P.2d at 1307. *See also State v. Frank,* 92 N.M. 456, 589 P.2d 1047 (1979). The prosecutor's remark specifically brought to the jury's attention Colson's failure to testify and, thereby, constitutes reversible error. *See Gonzalez v. State.* The mistake or inadvertence of the prosecutor in making the comment does not lessen its prejudicial impact. *See id.; State v. Frank.*

 The test employed in determining whether an accused's fifth amendment privilege against self-incrimination has been violated by a comment of the prosecutor, is whether the language used directly called the jury's attention to defendant's failure to testify, or whether the statement was of such character that a jury would naturally and necessarily assume the remarks to be a comment on the accused's failure to become a witness. *See State v. Hunter,* 29 Wash.App. 218, 627 P.2d 1339 (1981). Where the comment specifically refers to defendant's failure to testify, the state bears the burden of establishing that the comment complained of did not contribute to defendant's conviction. *State v. Jones,* 80 N.M. 753, 461 P.2d 235 (Ct.App. 1969). The state has not persuaded us that the error was harmless.

 Defendant Colson's reconsideration of his decision not to testify did not open the door to the prosecutor's remark concerning his failure to testify in the presence of the jury. While the remark amounted to error as to defendant Colson, the remark, however, did not constitute error as to defendant Lopez, who elected to testify on his own behalf. *Cf. Holdge v. State,* 586 P.2d 744 (Okla.Crim.App.1978). On appeal, Lopez fails to cite any authority or to explain how this remark resulted in prejudice to him. *See In re Adoption of Doe,* 100 N.M. 764, 676 P.2d 1329 (1984). The remark was directed solely to defendant Colson's failure to testify and did not implicate defendant Lopez, who testified at length in his own defense. Although we hold there was reversible error as to defendant Colson, we address the remaining issues in light of the necessity for a new trial for defendant Colson.

## IV. PROSECUTORIAL MISCONDUCT

Defendants complain of four instances of misconduct by the prosecutor.

**(A) *Reference to Badge.*** During the defense portion of the case, while defendant was testifying, two defense exhibits were introduced: (1) a badge worn by Lopez at the time of the incidents in question; and (2) an accompanying identification card. During cross-examination, the prosecutor referred to a "phony badge." Defendant Lopez admitted that the badge worn by him was not issued by an official law enforcement agency.

 Defendant made a general objection without stating a specific ground, and the objection was overruled. A similar motion for mistrial was also overruled. On appeal, defendant contends the remark of the prosecutor was an improper reference

to Lopez's character and intimated to the jury that Lopez was impersonating an officer. An objection not sufficiently specific to call the trial court's attention to the particular reason for the inadmissibility of the matter will be treated on appeal as if no objection had been made. *Tobeck v. United Nuclear-Homestake Partners,* 85 N.M. 431, 512 P.2d 1267 (Ct.App.1973). Even though a matter may properly be excluded on a particular ground, it is not error to admit testimony where no proper objection is asserted in the trial court. *State v. Casteneda,* 97 N.M. 670, 642 P.2d 1129 (Ct.App.1982).

Defendants further argue that the court should have sustained their objection to the prosecutor's remark, that the reference should have been stricken from the record, and that the jury should have been admonished to disregard it. The record does not reflect that defendants sought this relief below. If further relief is sought, objecting counsel must move to strike the testimony or to seek an admonition to the jury. *See State v. Casteneda; State v. Sandoval,* 88 N.M. 267, 539 P.2d 1029 (Ct.App. 1975).

■ **(B)** *Reference to Incident in Mexico.* Defendant Lopez went to Mexico in 1983 to pursue an alleged bail jumper and return him to Texas. The prosecutor initially indicated that he planned to call witnesses from Mexico to testify in the present case concerning Lopez's prior acts of forcibly seizing and returning another individual to Texas. At a pretrial hearing, defendants sought a continuance on the basis that they did not have sufficient opportunity to interview the Mexican witnesses on this issue. The prosecutor then withdrew his efforts to call the witnesses, and stated that he would not introduce testimony against Lopez touching upon "prior bad acts of this nature."

During defendants' case-in-chief, Lopez called as a witness Luther Jones, the El Paso County prosecutor. Jones testified that defendants were in good standing as bondsmen in El Paso and that Lopez had a "clean" file. On cross-examination, the prosecutor inquired: "so that you wouldn't

have any records, for example, of any difficulties that Mr. Lopez might have had in * * * Mexico * * *?" The witness stated, "No." On appeal, defendants contend the prosecutor failed to abide by a pretrial promise and such action amounted to prosecutorial misconduct. No objection was stated to this inquiry. Defendants cannot complain on appeal of claimed errors which were not objected to below. *See State v. Gutierrez,* 91 N.M. 54, 570 P.2d 592 (1977).

■ **(C)** *Coaching Testimony.* During direct examination, deputy Henderson testified that he became "scared" and felt "threatened" when Lopez picked up his shotgun and threatened to shoot. He also stated that he felt scared and threatened by Lopez's "menacing conduct" with the shotgun. On cross-examination, Henderson was asked why he used the phrase "menacing conduct" to describe the incident. He stated that he felt menaced and admitted that he had heard the term used by the prosecutor and had referred to the same language contained in the statutes defining assault and battery.

Defendant Sandoval moved for a mistrial contending that the prosecutor had improperly coached the witness. While it is patently improper for a prosecutor to advise a witness to testify falsely or to phrase a witness' testimony, there is no showing in the record that the witness testified falsely or that Henderson was not, in fact, threatened or menaced by defendants' actions. The record does not support the claim of improper coaching. We find no error in the court's ruling denying the motion for mistrial.

■ **(D)** *Prejudicial Charge.* Deputy Garcia testified that Lopez had searched him for weapons before allowing him to enter the Ojinaga residence. Defendants made an offer of proof to the court that Garcia had allegedly told Henry Quintero, an attorney, that he had a back-up weapon when he entered the house. In conjunction with their offer of proof, defendants told the court that Quintero, if called, would testify regarding Garcia's possession of a back-up weapon. At this point the prosecutor agreed to dismiss, with prejudice, the

charge of battery against defendants. This charge was premised in part upon the allegation that defendants had searched deputy Garcia and disarmed him when he arrived at the residence.

Defendants moved for a mistrial, contending that dismissal of the charge of battery on the motion of the state was prejudicial because the testimony regarding the charge had been admitted prior to the dismissal. Defendants also contend that the prosecutor charged this count for improper reasons. There was a basis in the evidence for the charge. Defendants' contention is without merit. We find no prosecutorial misconduct on this issue. Moreover, the jury's subsequent acquittal of Colson on two counts, and the acquittal of Lopez on one count of alleged assault on Garcia, indicates the jury was not improperly influenced.

Defendants also argue that the trial court erred in refusing to permit them to call Quintero as a defense witness. Defendants claimed Quintero's testimony would show that the Ojinagas had allegedly made prior inconsistent statements.

Defendants contend that Garcia's statement that he had obtained a gun when he went into the residence was false and that he had the weapon hidden on him when he entered the home. Based on this premise, defendants argue that if the gun was hidden on Garcia, this evidence would directly contradict Garcia's testimony that he was the victim of a battery when Lopez undertook to "frisk" him. We find no error in the trial court's ruling excluding Quintero's testimony on this matter. At an in-camera hearing, Quintero testified that his knowledge of occurrences on the date of the incident was privileged communication which he could not disclose under the attorney-client privilege. He stated that he had been hired by the Ojinagas to explore the filing of a civil suit growing out of this incident. Defendants' offer of proof as to the subject matter of Quintero's testimony did not disclose that deputy Garcia or the Ojinagas testified falsely or that the matter sought to be established would be corroborated by Quintero.

Viewing each of the alleged instances of prosecutorial misconduct, in isolation and as a whole, we do not consider the conduct improper or prejudicial so as to deprive defendant Lopez of a fair trial.

## V. EXCLUSION OF EVIDENCE

In light of our ruling under the point above, we consider the claim of defendant Lopez that the trial court erred in excluding material testimony and evidence at trial.

Defendants sought to disqualify the District Attorney, David Lane, from prosecuting the case against them, contending that he was allegedly aware of specific instances of violence on the part of undersheriff, Daniel Garcia, and that they planned to call the district attorney and Tim Kling, an investigator, to testify about Garcia's propensity for violence.

Following an in-camera hearing, the trial court denied the motion to disqualify the district attorney and ruled that the testimony of Lane and Kling was inadmissible. We find no error in the trial court's refusal to disqualify the district attorney or in its exclusion of evidence regarding Garcia's alleged propensity for violence.

When the trial court refuses to permit a prosecutor to be called as a witness for the defense, the issue on appeal is whether the court abused its discretion. *State v. Hogervorst.* Specific acts of violence by the victim may be introduced by defendant if there was evidence that defendant had been informed or knew of the acts at the time of the incident. *State v. McCarter*, 93 N.M. 708, 604 P.2d 1242 (1980). Here, there was no evidence that defendants knew Garcia or had been informed of Garcia's alleged propensity for violence at the time of the incidents for which defendants were tried. In addition, defendants were not prejudiced by the exclusion of this evidence, nor did the exclusion of this evidence improperly shift the burden of self-defense to defendants. The jury acquitted both defendants of the charge of aggravated assault upon deputy Garcia. It was not error to exclude this

evidence. The evidence of Garcia's alleged propensity for violence was irrelevant to the other charges against defendants.

## VI. CUMULATIVE ERROR

 Defendants argue that the instances of prosecutorial misconduct itemized under Point IV, above, served to deny them of a fair trial and constitute cumulative error. The doctrine of cumulative error has no application if no cumulative errors are committed and defendant has received a fair trial. *See State v. McGuinty,* 97 N.M. 360, 639 P.2d 1214 (Ct.App.1982). Additionally, defendants contend that the trial court committed five other errors which, *in toto,* deprived them of a fair trial. The other errors are: (1) exclusion of exhibits and defendant Lopez's testimony regarding his good faith reliance on the common law and the statutory privilege of a bondsman to arrest a principal; (2) denial of defendants' requested jury instructions regarding the arrest rights of a bondsman and the failure to properly respond to jury questions; (3) failure to disqualify district attorney; (4) error in the exclusion of testimony regarding deputy Garcia's propensity for violence and prior bad acts; and (5) denial of defendants' motion for mistrial.

We have examined the records and there is no basis for the claim of cumulative error. *See State v. McGuinty; cf. State v. Martin,* 101 N.M. 595, 686 P.2d 937 (1984).

## CONCLUSION

The convictions and sentences of defendant Colson are reversed and the cause is remanded for a new trial. We affirm the convictions of defendant Lopez.

IT IS SO ORDERED.

MINZNER, J., concurs.

GARCIA, J., concurring in part & dissenting in part.

GARCIA, Judge (concurring in part and dissenting in part).

I concur in the opinion with the exception of that portion concerning reversal of Colson's conviction based on the prosecutor's comments. I do not view the prosecutor's statement as a direct comment on Colson's failure to testify.

*Gonzales v. State,* 94 N.M. 495, 612 P.2d 1306 (1980) is cited as New Mexico's authority on this proposition. The comment in *Gonzales,* however, was far different. The prosecutor said:

And did you hear one word from the defense, one word of denial that he beat him with this 2 × 4. Not one word of denial * * *. What was his justification for doing to Byron what he did? He didn't tell you, the defense didn't tell you what the reason was. He didn't give you any justification. He didn't deny that he hit him with a 2 × 4 and he didn't tell you why.

*Gonzales* at 495, 612 P.2d 1306.

The prosecutor's comments concerned defendant's failure to justify, explain or deny the alleged misconduct; those direct comments are forbidden by the Fifth Amendment to the Constitution.

In the present case, it is undisputed that defense counsel advised the prosecuting attorney that Colson would testify, and in fact, extracted a concession not to cross-examine him. Anticipating defendant's testimony, the prosecutor arranged for rebuttal witnesses. The record indicates that the judge inquired of prosecutor whether he would present rebuttal testimony and the prosecutor responded:

Yes, sir, we intend to have two rebuttal witnesses. Um. Having been told that Mr. Colson was going to take the stand, uh, its going to take me about * * *.

Certainly the prosecutor's comments were improper, and the state concedes as much. Improper as they may have been, I believe they are more in line with the "indirect comments" on defendant's failure to testify as discussed in *State v. Dominguez,* 91 N.M. 296, 573 P.2d 230 (Ct.App.1977). Our cases have drawn distinctions between direct and indirect comments. The former are constitutionally forbidden and will result in reversible error. The latter may not result in reversible error under the particular circumstances of the case. I would determine that under the circumstances in this case, the indirect comment did not re-

quire a reversal. *State v. Carmona*, 84 N.M. 119, 500 P.2d 204 (Ct.App.1972).

I respectfully disagree with that portion of the opinion.