415 So.2d 785 (1982)
Russell Bruce MONCRIEF, Appellant,
v.
STATE of Florida, COMMISSIONER OF INSURANCE, Appellee.
No. UU-174.
District Court of Appeal of Florida, First District.
June 8, 1982.
*786 James C. Weart, Sanford, for appellant.
Thomas A.T. Taylor, S. Strom Maxwell and Steven R. Scott, Tallahassee, for appellee.
*787 PER CURIAM.
Moncrief, a licensed bail bondsman, appeals an order of the Department of Insurance (Department) fining him a total of $500.00 on all three counts of an administrative complaint and placing him on probation for a period of one year for violating each of the three counts. A hearing officer of the Division of Administrative Hearings recommended certain findings, which the Department accepted, while at the same time rejecting the recommended conclusions that Moncrief be issued only a letter of admonition for one of the alleged charges, and that no penalties be imposed for the other two charges.
We affirm the Department's order as to Count I, but reverse it as to Counts II and III. The pertinent evidence and findings in support of each count are as follows:

COUNT I
Count I charged that the appellant knowingly hired one Delbert Leroy Sams to perform the duties of a bail bond runner, although Sams was not licensed as a runner, in violation of Sections 648.30[1] and 648.45(1)(b), Florida Statutes (Supp. 1976).[2] Following the administrative hearing, the hearing officer made the following findings of fact as they relate to the facts alleged under Count I:
Shortly after Respondent opened his bail bond office, he was approached by Sams who represented himself as a bounty hunter who could pick up "skips" and others the bail bondsman wanted for surrender under their bonds. Sams represented that he was a member of the Florida Assurity Association, that he so worked for several bail bondsmen and was qualified to pick up skips for bail bondsmen. Sams produced an impressive badge, business cards and arrest forms for the bondsman to sign which would authorize Sams to pick up the individuals who had skipped out on their bonds.
At this time Respondent had no skips to pick up and suggested Sams contact him later; and, during the period between June and September, 1978, Sams picked up some five (5) to eight (8) individuals on whom Respondent had written a bond and returned these people to Respondent. For these services, Respondent paid Sams a percentage of the bond.
This relationship with Sams terminated when the latter gave Respondent a worthless check.
Subsequently, Sams learned that his "bounty hunting" was unauthorized and applied for licensure as a bail bond runner. During Petitioner's investigation of Sams' application, his association with Respondent became known and Respondent told Petitioner's agents of his relationship with Sams. This led to an investigation of Respondent and to the charges here preferred.
The hearing officer concluded from the above findings that although the employment of Sams by Moncrief to pick up "skips" was in violation of the law, and although Moncrief should have been aware that Sams could not apprehend skips without the latter's licensing as a runner, he nevertheless recommended that Moncrief be issued only a letter of admonition because the "employment stemmed from lack of knowledge on the part of respondent [Moncrief] and not from an intent to violate the laws regulating bail bondsmen."
The record substantially reveals that Moncrief was aware that Sams was not licensed. Moncrief's lack of knowledge pertained not to a mistake of fact, but to a mistake of law  his belief that he was not required to have Sams licensed because he was not exclusively in his employ. As to *788 the latter, the courts universally recognize that ignorance or mistake of law will not excuse an act in violation of the laws so long as the laws clearly and unambiguously proscribe the conduct alleged. See 21 Am.Jur.2d Criminal Law § 94 (1965).
The main thrust, however, of Moncrief's argument as it pertains to that portion of the Department's order sustaining Count I of the administrative complaint is that Moncrief had a common law right as a bail bondsman to delegate his authority to an agent, a right specifically recognized by the United States Supreme Court in Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (1873); consequently, he was not required to license Sams since Sams was not a "runner" as defined by Sections 648.25(6)[3] and 648.37(1)(c),[4] Florida Statutes. This argument is without merit. The common law right of a bail bondsman to delegate his authority to an unlicensed agent has been abrogated by statute in Florida. See Register v. Barton, 75 So.2d 187 (Fla. 1954). The licensing requirement is all inclusive by virtue of Section 648.30, Florida Statutes, which indisputably provides that all runners shall be licensed. Section 648.25(6) includes in its definition of a "runner" "a person employed by a bail bondsman to assist ... in the apprehension and surrender of the defendant." Sams was hired by Moncrief to perform this very function. Thus, Sams was either a "runner" or was performing "the functions, duties or powers prescribed for ... runners." Further, Fla. Admin. Code Rule 4-1.06 specifically placed a duty on Moncrief to have Sams licensed.
The appellant's contention that the statutory definition of "runner" in Section 648.25(6) is violative of due process because of a vagueness or overbreadth is without merit. Cf. Jr. Food Stores of West Florida, Inc. v. Division of Alcoholic Beverages and Tobacco, 390 So.2d 1244 (Fla. 1st DCA 1980).
Because the order as it relates to Count I was substantially supported by the evidence, the Department was justified in rejecting the hearing officer's recommended penalty and imposing its substituted penalty as it was one which it could impose within its range of discretion. See Fla. Real Estate Comm'n. v. Webb, 367 So.2d 201 (Fla. 1978); Hartnett v. Department of Ins., 406 So.2d 1180, 1181, n. 1 (Fla. 1st DCA 1981).

COUNT II
The evidence supporting the Department's order as to Count II was, however, far less substantial than that under Count I. Count II alleged that Moncrief's alteration of a jail card rendered him untrustworthy. As to the evidence supporting that charge, the reviewing agency accepted the hearing officer's findings of fact, yet drew the opposite conclusion from that recommended, holding on the facts found that the alteration of a jail card was, under the circumstances, reflective of untrustworthiness, and therefore was, as denounced by Section 648.45(1)(j), "a source of detriment, injury or loss to the public." We disagree.
The hearing officer specifically found:
On or about February 28, 1978, Respondent was given the jail card of Willie Frank Boone by the booking officer to use in preparing a bailbond. Boone had previously been bonded by Respondent and he was somewhat familiar with Boone's record. While the card was in his custody, Respondent thought one entry *789 on the card was an error and interlined that item. Further perusal of the card led Respondent to realize the card had not been in error. When he returned the card to the booking officer, he told the booking officer of the changes he had made to the card. This caused considerable consternation in the booking officer and led to procedural changes to not allow custody of the jail cards to be given to bail bondsmen. The change to the jail card made by Respondent could not benefit Respondent financially or otherwise. However, the change could have affected the sentencing of the accused.
The above findings, accepted by the Department, show that while Moncrief deliberately altered a jail card relating to one of his clients, he did so in the honest belief that certain information on the card was incorrect. When he discovered, to the contrary, that his belief was ill-founded, he immediately reported the alteration to the booking officer. We agree with the hearing officer's conclusion that such action is not tantamount to untrustworthiness. "Trustworthy" is defined in Webster's New Collegiate Dictionary (1976) as the state of being worthy of confidence or of being dependable. If untrustworthiness means the opposite, namely the status of one lacking in confidence or dependability, then the findings do not reveal that appellant's conduct fell within the statute's terms.
The crucial issue narrows simply to whether the alteration of the jail card was, under the circumstances, equivalent to untrustworthy conduct. We consider that the answer to this question rests upon the following general principles from Bowling v. Dept. of Ins., 394 So.2d 165, 172 (Fla. 1st DCA 1981):
[W]hen the standards of conduct to be enforced are not explicitly fixed by statute, or by rule, but depend on ... debatable expressions ...; when the conduct to be assessed is past, beyond the actor's power to conform it to agency standards announced prospectively; and when the proceeding may result in the loss of a valuable business or professional license, the critical matters in issue must be shown by evidence which is indubitably as "substantial" as the consequences.
Here, as in Bowling, because the matter at issue is not one involving Department policy, it was therefore one which the agency was required to prove by conventional facts  i.e., expert testimony, documentary opinion, or other evidence "appropriate in form [to] the nature of the issues involved." Anheuser-Busch, Inc. v. Dept. of Business, 393 So.2d 1177, 1183 (Fla. 1st DCA 1981). No facts were adduced revealing that Moncrief's conduct necessarily rendered him untrustworthy or undependable. Having accepted the recommended findings, the Department was not then at liberty to draw the opposite conclusion  as it was as to the recommendations pertaining to Count I  that Moncrief's conduct necessarily rendered him untrustworthy. If the Department had wished to present evidence directed to that issue, it should have done so. Other evidence might have been presented, from say Moncrief's peer group, that the intentional alteration of a jail card would be considered untrustworthy behavior under any circumstance. Such a conclusion could not be drawn from the findings before us, however; no more than could, for example, the agency's conclusion that a teacher's effectiveness as an employee of a school board had been reduced because of the commission of certain conduct, without substantial evidence directed to that issue. See Boyette v. Professional Practices Council, 346 So.2d 598, 600 (Fla. 1st DCA 1977); Jenkins v. State Bd. of Ed., 399 So.2d 103, 105 (Fla. 1st DCA 1981).
The Department was required to establish its allegations under Count II by a record foundation. In adopting the recommended findings that Moncrief had mistakenly altered the card, had returned the card to the booking officer with his admission of the change, and that the alteration could not benefit Moncrief financially or otherwise, the Department must be considered to have effectively rejected and dismissed as unfounded all implications of untrustworthy conduct. Cf. Jenkins v. State Bd. of *790 Ed., supra. Accordingly, the penalty imposed as to Count II is vacated.

COUNT III
In Count I, both the conduct alleged and the standard prescribed for such conduct were established by substantial evidence. The charge under Count II failed in that the conduct alleged was not substantially supported by evidence. On the other hand, the conduct alleged as to Count III was clearly established since there is no factual dispute that Moncrief's office was not open during the specified morning hours during March, 1979. The only material issue is whether the standard sought to be enforced for such conduct was satisfied by the necessary quantum of evidence. We find that it was not.
Moncrief was fined $100 because he failed, as charged in Count III, to maintain his office during "normal business hours" in violation of Section 648.34(2)(c)[5] and Rule 4-1.04, Florida Administrative Code.[6] Neither the statute nor the rule defines the term "normal business hours." The Department was therefore required to prove by conventional facts that Moncrief's bonding office should have been accessible to the public, as the Department contends, between the hours of 8:00 or 9:00 a.m. until 4:00 to 6:00 p.m. The hearing officer's recommended conclusion in this regard was equivocal; it stated that Moncrief failed to have his office open during the morning hours prior to April, 1979, in violation of the rule, however the violation was not willful.
The material evidence as to Count III reveals the following: That from early 1978 until April, 1979, Moncrief's office was usually opened around noon by a secretary who remained there until 6:00 p.m.; that Moncrief normally arrived between 2:00 and 4:00 p.m., and kept his office open until midnight. Additionally, at the time of the specified period of violations, a 24-hour answering service was available to page Moncrief when he was not at his office. Finally, the evidence reflected that on one occasion when the office was closed, Moncrief had a sign posted inside the office, visible from the outside, stating a telephone number where he could be reached, as well as a time clock on the window advising when he would return.
As in Anheuser-Busch, Inc. v. Dept. of Business, supra, this is a case in which policy-making by rules is preferable to orders. This is so because the Department seeks to establish an industry-wide policy requiring bondsmen to maintain offices open to the public during certain specified hours. As the matter in issue is one of Department policy, a Department rule would be well-nigh conclusive. Cf. Bowling v. Dept. of Ins., supra at 174. Yet, because there was no rule announcing the agency's policy prospectively, the Department now seeks to extract its policy by an order from events viewed retrospectively.
We decline to accept the agency's contention that the term normal business hours means, as a matter of common knowledge, the so-called typical work day from 8:00 or 9:00 a.m. through 5:00 or 6:00 p.m. Since the Department now contends that such hours are typical of the bonding industry, it was, in the absence of a rule articulating its policy, obliged to demonstrate such evidence by ordinary methods of proof, i.e., by adjudicative facts rather than by legislative facts. See Bowling v. Dept. of Ins., supra at 174 for the distinction between the two terms. It could have presented evidence that there was some agreement, manual, or common understanding among bondsmen that they were required to maintain their *791 offices during the mornings. The evidence on this issue was hardly substantial. In answer to the question whether any interpretation had been placed on the term normal business hours by the agency, the Department's agent, Mr. Thayer, responded:
A. I think the interpretation would be that unless otherwise published and, then, it would be ... the normal business hours have been construed to be the normal daytime operating hours available to the public.
If the bail bondsman should say my hours are from 4:00 o'clock in the afternoon till 4:00 o'clock the next morning, if it's published the people are aware of that, then perhaps that would be his normal business hours.
But generally, it would be construed that people needing bonds or needing to check records or Department personnel, then they don't do that after hours. The normal business hours are construed to be somewhere between 8:00 and 9:00 and 4:00 and 5:00, 6:00 in the afternoon.
The source of Mr. Thayer's interpretation did not come from established Department policy; it was based instead upon his experience. Observe the following:
Q. Now I believe you also stated that it had been your experience that during the early morning hours that there would be bondsmen available.
Can you tell me which bondsmen or agencies that you have checked with and found this to be true?
A. Do you want me to name a specific agency?
Q. If you can think of one offhand.
A. I don't know any particular one that ... I've been with the Department eight years all over Florida. You know, I don't know any particular one that I would choose to pick out and say that's the particular one.
Q. In other words, you're just saying that it's your opinion, really, that this is practice.
A. Well, I wouldn't say its my opinion, it's my experience.
Mr. Thayer's "experience" did not document the number of bondsmen's offices that were actually open during the morning; indeed it did not substantially rebut Moncrief's testimony that he considered his normal work day to be from noon until midnight due to the large volume of work then transacted, and the fact that he rarely ever was called upon to write bonds during the morning. If anything, Thayer's testimony corroborated Moncrief's by its acknowledgement that different hours could be maintained if a public notice were posted advising the hours of accessibility. Mr. Thayer's testimony of his experience as to the normal hours of a bonding business can hardly be deemed substantial evidence supporting a retrospective characterization of conduct requiring the imposition of a penalty upon the actor's license. Accordingly, the Department's order as it relates to Count III must be vacated.
The order is affirmed as it relates to Count I and reversed as to Counts II and III.
ERVIN, SHAW and WENTWORTH, JJ., concur.
NOTES
[1] Section 648.30 provides:

No person shall act in the capacity of a professional bail bondsman, limited surety agent, or runner, or perform any of the functions, duties or powers prescribed for bail bondsmen or runners under the provisions of this chapter unless that person shall be qualified and licensed as provided in this chapter.
[2] Section 648.45(1)(b) permits the Department to suspend or revoke any license for violation of any law relating to bail bonding in the course of dealings under the license.
[3] Section 648.25(6), Fla. Stat. provides:

"Runner" shall mean a person employed by a bail bondsman for the purpose of assisting the bail bondsman in presenting the defendant in court when required, or employed by the bail bondsman to assist in the apprehension and surrender of the defendant or the court, or keeping the defendant under necessary surveillance. This does not affect the right of a bail bondsman to hire counsel, or to ask assistance of law enforcement officers.
[4] Section 648.37(1)(c), Fla. Stat. provides:

It must affirmatively appear from the application:
* * * * * *
That the applicant will be employed by only one bail bondsman, who will supervise the work of the applicant, and be responsible for the runner's conduct in the bail bond business.
[5] Section 648.34(2)(c) provides:

(c) That the place of business of the applicant will be located in this state and that such applicant will be actively engaged in the bail bond business and maintain a place of business accessible to the public.
[6] Rule 4-1.04 provides:

Section 648.34(2)(c), Florida Statutes, is interpreted to mean that every bail bondsman or general lines agent engaged in the bail bonds business be currently engaged in that business; that a place of business suitably designated as such must be maintained open and accessible to the public to render services during normal business hours.