COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Beales and Powell
Argued at Richmond, Virginia


CLIFTON L. COLLINS
                                                              OPINION BY
v.        Record No. 2598-09-2                      JUDGE RANDOLPH A. BEALES
                                                            DECEMBER 14, 2010
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
                              Leslie M. Osborn, Judge

                Ghislaine M. Storr Burks (Livesay & Myers, PC, on briefs), for
                appellant.

                Donald E. Jeffrey, III, Senior Assistant Attorney General
                (Kenneth T. Cuccinelli, II, Attorney General, on brief), for appellee.


        Clifton L. Collins (appellant) was convicted by the trial court of attempted abduction,

pursuant to Code §§ 18.2-26 and 18.2-47, and use of a firearm in the commission of an attempted

abduction, pursuant to Code § 18.2-53.1.  He argues in his appeal of these convictions that he

had "legal authority" for his attempt to seize the victim and that he did not have the specific

intent to abduct the victim.  Therefore, he contends, the trial court erred in convicting him of

attempted abduction and of using a firearm in the commission of that felony.  The

Commonwealth contends that appellant did not have authority under Virginia law to seize the

victim and that appellant's intention to abduct the victim was proven by the evidence at trial.  We

conclude that the trial court did not err in this case, and, thus, we affirm appellant's convictions.

I.  BACKGROUND

Appellant was licensed in North Carolina[1] as a bail bondsman.  In that capacity, he acted as the surety on a $10,000 bond to release James R. Sydnor, III, from the custody of North Carolina authorities pending his trial on an identity theft charge.  Sydnor failed to appear in the North Carolina court on October 18, 2006, and a motion was filed to forfeit the $10,000 bond.

After Sydnor's failure to appear in court on October 18, 2006, appellant heard that he would be in Virginia to attend a funeral at a church in Mecklenburg County on March 29, 2007.  Appellant drove to Mecklenburg County with his wife, his son, and an employee, with the intention to find Sydnor and return him to North Carolina.

Upon his arrival in Mecklenburg County, appellant met with Deputy Sheriff Steve Jones.  Jones told appellant that, because no extradition order had been issued for Sydnor, the sheriff's department could not get involved in any attempt to "apprehend" Sydnor.  When appellant asked what he should do "if things got out of hand," the deputy advised that he call 911.

After dropping off his son, appellant drove to the church where the funeral was held and arrived just after the ceremony had concluded.  He observed a man in a parking lot beside the church that he believed was Sydnor.  The man, who was actually C.S.[2] and not Sydnor, was opening the trunk of a car.

Appellant drove his truck into the parking lot and "parked perpendicular to the back" of C.S.'s vehicle, blocking it in.  Appellant then got out of his truck with a Glock handgun in his right hand, pointing it at C.S.  Appellant said, "I believe you see what it is m*****f***, you know what it is."  When C.S. said he did not have any money, appellant said, "this ain't about

----

[1] Appellant is not licensed as a bail bondsman or bail enforcement agent in Virginia.

[2] In order to attempt to provide a measure of privacy to the victim, we use these initials throughout this opinion rather than the victim's name.

money."  Appellant then grabbed C.S. by the shoulder and started pulling him toward the truck. Appellant called him "Jimmy" and continued to curse at him.

Appellant's employee, armed with a gun and a can of mace, then got out of the vehicle and walked around to the driver's side of the truck.  C.S. said, "I'm not Jimmy.  I'm not getting in the truck."  At this point, appellant asked C.S. for identification, and C.S. showed appellant his driver's license.  Appellant then told C.S. that he was a bail bondsman and that "Jimmy" owed him $20,000.  Appellant "very quickly" showed C.S. a badge, but he refused to show C.S. any other identification.  Having determined that C.S. was not the fugitive that he was seeking, appellant and his employee got back into the truck and left.

After appellant drove away, C.S. called 911 and informed the dispatcher that someone had just pointed a gun at him in the parking lot.  At trial, he testified that a third person, a woman, sat in the truck during these events.  C.S. also testified that he was Sydnor's cousin.

In his testimony at trial, appellant admitted that he had never seen Sydnor personally, but he did have a "mug shot" of Sydnor with him in order to help him identify Sydnor.  He also admitted talking to Sydnor's cousin in the parking lot, but denied having a gun and claimed that no one else was in the truck.  Appellant's son testified at trial that appellant's employee and appellant's wife initially went to the funeral with appellant.  The three of them then returned to the place where they had left the son.  Appellant then dropped off his two passengers and, according to his son, appellant actually returned to the church by himself.

At the conclusion of the trial,[3] appellant argued that he was licensed by North Carolina as a bail bondsman and, as a bail bondsman, he had a common law right to seize his bailees even if they were in another state.  Therefore, he claimed, he had a "legal justification or excuse,"

---

[3] The proceedings in this case were continued several times.  Although the evidence was presented on September 19, 2008, the parties did not present their final arguments until July 17, 2009.

pursuant to Code § 18.2-47, to abduct Sydnor – and, consequently, for his mistaken attempt to abduct C.S. from the parking lot. Appellant also argued that he did not have the required *mens rea* to convict him of attempted abduction.

The trial court found appellant did not have a legal excuse for his actions because statutory law, rather than the common law, regulates the actions of a bail bondsman or bail enforcement agent in Virginia. The trial court also found that the mistaken identity of the victim did not provide a "justification or a defense to this situation" and that the Commonwealth had proven the specific intent to abduct. The court found appellant guilty of attempted abduction and of using a firearm in the commission of a felony.

## II.  ANALYSIS[4]

### A.  Being a Bail Bondsman as a Legal Justification for an Attempted Abduction

Appellant argues that he was not guilty of attempting to abduct C.S. as he stood in the parking lot. He points to Code § 18.2-47(A), which defines abduction, and notes the phrase, "and without legal justification or excuse," in that statute. He claims that he had a legal excuse for his behavior. Specifically, appellant contends that, because he is a licensed bail bondsman in North Carolina, he had the legal authority under the common law to come into Virginia and seize Sydnor, his bailee, even though he was not also licensed as a bail bondsman in Virginia. Because he believed that C.S. was his bailee and he had a North Carolina license, he claims that

---

[4] On brief, appellant argues that, if his attempted abduction conviction is reversed, then his conviction for use of a firearm in the commission of that felony must also be reversed. Therefore, we do not discuss the firearm conviction separately in this opinion because appellant's argument for reversal of that conviction depends upon reversal of the attempted abduction conviction.

he was acting within his legal authority.[5] Therefore, he concludes that his behavior was not criminal.

Appellant relies upon Taylor v. Taintor, 83 U.S. 366, 371 (1873), and Levy v. Arnsthall, 51 Va. (10 Gratt.) 641 (1854), to support this argument that the common law allows bail bondsmen to capture their bailees if they are found in another state – whether the bail bondsman is licensed in the other state or not. The Commonwealth argues that, if such a common law right existed at one time, that right has been restricted by statute in Virginia. As this argument presents a disagreement over legal principles and statutory interpretation, it presents a question of law that this Court reviews *de novo*. See Ligon v. County of Goochland, 279 Va. 312, 316-17, 689 S.E.2d 666, 668-69 (2010); Pulliam v. Commonwealth, 55 Va. App. 710, 713, 688 S.E.2d 910, 911-12 (2010).

1. Virginia's Laws on Bail Bondsmen and Bail Enforcement Agents

Code § 1-200 states, "The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, *except as altered by the General Assembly*." (Emphasis added.) "[A] decision to abrogate . . . [a] longstanding common law principle is the proper function of the legislature, not of the courts." Robinson v. Matt Mary Moran, Inc., 259 Va. 412, 417-18, 525 S.E.2d 559, 562 (2000). When reviewing statutes to determine if the legislature has altered the common law, we apply several well-recognized principles:

> [A] statutory provision will not be held to change the common law
> unless the legislative intent to do so is plainly manifested.
> Therefore, a statutory change in the common law will be

---

[5] Because we find that appellant had no authority to personally seize Sydnor while he was in Virginia, we need not consider whether appellant reasonably believed that the person he attempted to abduct was Sydnor. Even if the man in the parking lot had actually been Sydnor, appellant had no legal justification for attempting to seize him at gunpoint.

recognized only in that which is expressly stated in the words of the statute or is necessarily implied by its language.

Herndon v. St. Mary's Hosp., Inc., 266 Va. 472, 476, 587 S.E.2d 567, 569 (2003) (citations omitted). In addition,

A statutory change in the common law is limited to that which is expressly stated or necessarily implied because the presumption is that no change was intended. When an enactment does not encompass the entire subject covered by the common law, it abrogates the common-law rule only to the extent that its terms are directly and irreconcilably opposed to the rule.

Boyd v. Commonwealth, 236 Va. 346, 349, 374 S.E.2d 301, 302 (1988) (citations omitted); Keister's Adm'r v. Keister's Ex'rs, 123 Va. 157, 162, 96 S.E. 315, 317 (1918). However, "where it is apparent that the legislature has made a value judgment with respect to certain behavior, it follows that the legislature intended to abrogate to that extent the common law . . . ." Long v. Commonwealth, 23 Va. App. 537, 544, 478 S.E.2d 324, 327 (1996) (discussing violations of the habitual offender statute and the defense of necessity).

For purposes of this appeal, we assume without deciding that the common law gave an out-of-state bail bondsman the authority to enter Virginia and seize his bailee without any restrictions, such as the necessity of obtaining a Virginia license. However, even making this assumption for the purposes of deciding this appeal, we conclude that the General Assembly has enacted legislation that alters the common law regarding bail bondsmen and their agents such that appellant – licensed only by the State of North Carolina – did not have the authority to act as a bail bondsman or bail enforcement agent in Virginia and to attempt to seize his North Carolina bailee while he was in Virginia.

The current structure used in Virginia for regulating bail bondsmen and their agents was created in 2004 by the General Assembly. Article 11 of Chapter 1, Title 9.1, of the Code

defines, regulates, and establishes the authority of "bail bondsmen."[6] Code § 9.1-185 to § 9.1-185.18; see 2004 Va. Acts 460. A "bail bondsman" is defined as "any person who is licensed by the Department [of Criminal Justice Services] who engages in the business of bail bonding and is thereby authorized to conduct business in all courts of the Commonwealth." Code § 9.1-185. Pursuant to Code § 9.1-185.18, a person commits a Class 1 misdemeanor by engaging "in bail bonding for profit or other consideration without a valid license issued by the Department in this Commonwealth." If a person does not "receive profit or consideration for his services," however, the provisions of Article 11 do not apply.

Under Article 11, the Department of Criminal Justice Services has "full regulatory authority and oversight of property and surety bail bondsmen." Code § 9.1-185.2. The Department is responsible for the development of regulations and licensing requirements that "ensure respectable, responsible, safe and effective bail bonding within the Commonwealth." Id. The Code itself sets some standards for the behavior of bail bondsmen, including rules for carrying a firearm and using a badge. Code §§ 9.1-185.10; 9.1-185.11; 9.1-185.12. In addition, the Code provides some basic minimum requirements for applicants for a license. Code §§ 9.1-185.4; 9.1-185.5. Nonresident applicants for a bail bondsman's license must meet the same licensing requirements as residents. Code § 9.1-185.7.

---

[6] Before enactment of this new statutory scheme, a person was authorized to act as a bail bondsman or "surety" under various provisions in the Code. See, e.g., Code § 38.2-1865.6 (repealed by 2004 Va. Acts 460) (giving the State Corporation Commission authority to issue "a surety bail bondsman license"); Code § 19.2-152.1 (repealed by 2004 Va. Acts 460) (giving circuit courts authority to issue certificates to property bail bondsmen).

During the same legislative session in 2004, the General Assembly enacted Article 12,[7] which defines, regulates, and establishes the authority for bail enforcement agents. Code § 9.1-186 to § 9.1-186.14; see 2004 Va. Acts 397. A bail enforcement agent, also known as a "'bounty hunter,'" is defined as any person who "engage[s] in bail recovery," Code § 9.1-186, excluding law enforcement officers and "licensed bail bondsmen," who are not regulated under Article 12. Code § 9.1-186.1. Code § 9.1-186.13 makes it a criminal offense to act as a bail enforcement agent in the Commonwealth without a license "issued by the Department."

The Criminal Justice Services Board (the Board) has "full regulatory authority and oversight of bail enforcement agents." Code § 9.1-186.2(A). The Board establishes licensing qualifications that "ensure respectable, responsible, safe and effective bail enforcement within the Commonwealth." Code § 9.1-186.2(B). The legislature created some minimum requirements for licensure. Code §§ 9.1-186.4 and 9.1-186.5. A nonresident applicant for a bail enforcement license must meet the same licensing requirements as a resident. Code § 9.1-186.7. The Department of Criminal Justice Services issues the licenses, in conjunction with the regulations established by the Board. Code §§ 9.1-186.3; 9.1-186.5; 9.1-186.6(A). The Code also includes a number of regulations on the behavior of bail enforcement agents, including rules for carrying a firearm and using a badge. Code §§ 9.1-186.8; 9.1-186.9; 9.1-186.10.

In the same legislative act that created Article 11, the General Assembly amended Code § 19.2-149. Instead of authorizing "a surety on a bond" to arrest his principal at any time, the statute now authorizes a "bail bondsman or his licensed bail enforcement agent" to "at any time arrest his principal." 2004 Va. Acts 460; Code § 19.2-149.

---

[7] Both of the 2004 Acts listed the new articles as "Article 11." The statutes enacted in 2004 Va. Acts 397, regulating bail enforcement agents, became Article 12. In addition, the section numbers listed in the Acts for the statutes in both Article 11 and Article 12 were changed by the Virginia Code Commission.

The licensing scheme created by the General Assembly when it enacted Articles 11 and 12 expressly limited the practice of bail bondsmen and their agents to only those people licensed by the Commonwealth to engage in these practices. In fact, the legislature specifically criminalized the practice of acting as a bail bondsmen or bail enforcement agent in Virginia "without a valid license issued by the Department." Code § 9.1-185.18; Code § 9.1-186.13. This Court would have to ignore the "expressly stated or necessarily implied" changes that the legislature made to the common law in order to find that a person, licensed as a bail bondsman by another state, may enter Virginia and act as a bail bondsman without a license issued by the Department of Criminal Justice Services.

The General Assembly also expressly regulated the behavior of bail bondsmen and bail enforcement agents in Virginia by enacting Articles 11 and 12. For example, bail bondsmen and bail enforcement agents must complete firearms training if they carry a firearm, Code §§ 9.1-185.11; 9.1-186.9, must verbally identify themselves on entering a residence, Code §§ 9.1-185.15(B); 9.1-186.12(B), and must (absent exigent circumstances) give the police twenty-four hours notice "of the intent to apprehend a bailee," Code §§ 9.1-185.15(C); 9.1-186.12(C). Bail bondsmen, who are licensed in Virginia under Code § 9.1-185, and "licensed bail enforcement agents" are the only people expressly permitted "at any time" to seize their bailees within the Commonwealth. Code § 19.2-149. Considering these enactments, together with the licensing requirements and other statutory changes enacted by the legislature in its 2004 session, we find that the legislature "directly and irreconcilably" abrogated the alleged common law rule that bail bondsmen can seize a bailee at any time and in any place. Boyd, 236 Va. at 349, 374 S.E.2d at 302. To find otherwise, especially given the facts in this case, would run counter to the General Assembly's express admonitions to the Department and the Board that they develop regulations to "ensure respectable, responsible, safe and effective" bail practices.

- 9 -

Code §§ 9.1-185.2; 9.1-186.2(B); see Robinson, 259 Va. at 417-18, 525 S.E.2d at 562 (explaining that the courts should defer to the legislature's determinations); Long, 23 Va. App. at 544, 478 S.E.2d at 327 (noting "where it is apparent that the legislature has made a value judgment with respect to certain behavior, it follows that the legislature intended to abrogate to that extent the common law . . .").

### 2. Other States' Regulation of Bail Bondsmen

Appellant argues that interpreting the Code as abrogating the common law would lead to "absurd results." He contends, if this Court finds that he cannot forcibly take his fugitive bailee from Virginia, then fugitives from across the country will rush to Virginia to avoid capture. His argument is not persuasive for at least two reasons.

First, appellant assumes that the common law authority is the only means of capture available to out-of-state bail bondsmen. However, this premise is untrue. As Deputy Sheriff Jones pointed out to appellant, if he had an extradition order from North Carolina, then the county law enforcement authorities could have arrested Sydnor. See Code §§ 19.2-85 to 19.2-118 (the Uniform Criminal Extradition Act). In addition, Virginia has licensed bail bondsmen and bail enforcement agents who are explicitly permitted by statute to capture bailees. Code § 19.2-149. Thus, the legislature has provided other options for the return of fugitives to our sister states, even if it abrogated some common law authority that may have once existed for out-of-state bail bondsmen to seize their bailees in Virginia.

The second problem with appellant's argument is his assumption that this Court's finding is unique – that no other state has found that its statutory scheme abrogates the common law right of a bail bondsman to seize his out-of-state bailee. Contrary to appellant's suggestion, however, several states have already found that the common law right of a bail bondsman to take a bailee into custody at any time and at any place has been abrogated by legislative action. For

example, the New Mexico courts have held that "a foreign bondsman must comply with the UCEA [Uniform Criminal Extradition Act] in seeking the rearrest of his principal." Lopez v. McCotter, 875 F.2d 273, 275 (10th Cir. 1989) (citing State v. Lopez, 734 P.2d 778, 782-83 (N.M. Ct. App. 1986)). The Massachusetts courts have concluded that "the common law right of a bondsman to seize a principal for surrender" while he is in another state "was abrogated by the [Uniform Criminal Extradition] Act." Commonwealth v. Wilkinson, 613 N.E.2d 914, 917 (Mass. 1993). California has "regulate[d] the business and practices of bail bondsmen," including the permissible actions of out-of-state bail bondsmen. Ouzts v. Maryland Nat'l Ins. Co., 505 F.2d 547, 551-53 (9th Cir. 1974). The United States Court of Appeals for the Sixth Circuit, in a tort action arising in Ohio, noted that a bail bondsman in that state does not have "the broad power" to violate the law, but rather "must abide by the law of the state he enters to pursue his fugitive." Lund v. Seneca County Sheriff's Dep't, 230 F.3d 196, 198 (6th Cir. 2000). The Court of Appeals of Oregon found that, even if the common law had allowed out-of-state bail bondsmen to arrest their bailees without any restrictions, that common law rule was "no more" in Oregon given the enactments of that state's legislature in 1973. State v. Epps, 585 P.2d 425, 429 (Ore. App. 1978). Several other states have held that the common law authority of bail bondsmen and their agents has been replaced by statutory regulation of their behavior and practices. Walker v. Commonwealth, 127 S.W.3d 596, 606 (Ky. 2004) ("Even if accurate at one time, the Taylor dictum clearly does not describe the present law of Kentucky as defined since 1976 in KRS 440.270(2)."); State v. Shadbolt, 590 N.W.2d 231, 233-25 (S.D. 1999) (finding a bail bondsman did not properly delegate authority to an agent because he was not licensed by the state to act as a "runner"); Green v. State, 829 S.W.2d 222, 223 (Tex. Crim. App. 1992) ("Statutory guidelines have replaced the common law in Texas and define the law as it applies to sureties who seek to apprehend principals."); Moncrief v. State, Comm'r of Ins., 415 So. 2d 785,

788 (Fla. Dist. Ct. App. 1982) ("The common law right of a bail bondsman to delegate his authority to an unlicensed agent has been abrogated by statute in Florida.").

The Virginia legislature has clearly indicated that only bail bondsmen and bail enforcement agents licensed by the Commonwealth are permitted to act as bail bondsmen and bail enforcement agents in Virginia. Appellant's contention that he has the unlimited right to approach someone with a gun and attempt to forcibly take that person to another state – without any interference or process in Virginia – clearly runs counter to the legislature's intent when it enacted Articles 11 and 12. Any common law right of out-of-state bail bondsmen to enter Virginia and seize a bailee has been abrogated by statute. Therefore, we find that appellant did not have legal authority to enter Virginia and unilaterally seize a person that he thought was his bailee.

3. Attempted Abduction by an Out-of-State Bail Bondsman Unlicensed in Virginia

Code § 18.2-47(A) states:

> Any person who, by force, intimidation or deception, *and without legal justification or excuse*, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of "abduction."

(Emphasis added.) Appellant was charged with attempted abduction of C.S., pursuant to this statute and to Code § 18.2-26, the attempted felony crimes statute.

Appellant claims that he had a "legal justification or excuse" for his behavior. He maintains that he, a North Carolina bail bondsman who was not licensed in Virginia, believed that he was seizing his bailee as the common law allowed him to do. However, the General Assembly has abrogated this common law right, see *supra* section II(A)(1), if such a right existed at common law. Therefore, appellant did not have a legal justification or excuse for his abduction of C.S., just as he would have no legal justification or excuse for an abduction of

- 12 -

Sydnor himself. In fact, pursuant to Code § 9.1-186.13,[8] appellant acted illegally when he attempted to seize the person he thought was Sydnor because he "engage[d] in bail recovery in the Commonwealth without a valid license issued by the Department."[9]

Appellant also argues that, even if the common law has been abrogated, he was not required to be licensed in Virginia because he had a North Carolina license and was acting pursuant to that license. He provides no support for his contention that a North Carolina license authorizes him to act in Virginia, other than his argument that the common law allowed such practices. We find that the Virginia Code did apply to appellant's behavior and that he was required to be licensed in Virginia in order to act as a bail bondsman or bail enforcement agent in the Commonwealth.[10]

Code § 19.2-149 permits bail bondsmen who are licensed in Virginia and similarly licensed bail enforcement agents to seize their bailees. Appellant did not have such a license, so the Code did not authorize his seizure of Sydnor or anyone else in Virginia. Code §§ 9.1-185.18 and 9.1-186.13 prohibit people who are not licensed by the Department from acting as bail bondsmen or bail enforcement agents in Virginia. In this case, appellant acted as a bail bondsman or as a bail enforcement agent (or both), in attempting to seize his bailee by force and return him to the North Carolina authorities. Clearly, the Virginia statutory scheme regulating

---

[8] This record does not indicate that appellant was charged with violating Code § 9.1-186.13, and the trial court did not consider whether his behavior was illegal under this statute.

[9] On brief, appellant claims that he did not receive compensation for his behavior in Virginia, so he was not acting as a "bail bondsman" under the Code. See Code § 9.1-185. However, appellant was responsible for the $10,000 bond on which Sydnor was released by the North Carolina authorities. Therefore, appellant certainly would be compensated for the capture and return of Sydnor.

[10] We are not asked in this appeal to determine if a bail bondsman or bail enforcement agent, licensed in Virginia, could have legally attempted to seize C.S. in the specific manner that appellant attempted here.

the practices of bail bondsmen and bail enforcement agents covered appellant when he entered the Commonwealth to find Sydnor and drag him back to North Carolina.[11]

## B. Existence of an Intent to Abduct

Appellant contends that the evidence was insufficient to prove that he intended to commit an abduction because the evidence proved only that he thought he was legally seizing Sydnor, his bailee. In other words, he made a mistake of fact regarding the identity of the man in the parking lot, confusing Sydnor with his cousin, C.S. [12]

"When reviewing a sufficiency of the evidence claim on appeal, the function of this Court is to evaluate whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Williams v. Commonwealth, 42 Va. App. 723, 734, 594 S.E.2d 305, 311 (2004) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (en banc)). As part of this review, we must consider "that evidence which tends

---

[11] Appellant also argued on brief that convicting him of abduction, given the facts in this case, violated his due process rights. However, as appellant admitted to this Court, this due process argument was not presented to the trial court. Therefore, he did not preserve this argument for appeal pursuant to Rule 5A:18.

Rule 5A:18 includes exceptions for good cause or to meet the ends of justice. However, appellant simply states that this Court should apply the ends of justice exception "since the uncertain state of law in Virginia" did not afford him due process. As discussed, *supra*, we find that the Code very clearly prohibits anyone who is not licensed by the Commonwealth to act as a bail bondsman within the territorial limits of Virginia. In short, there is nothing uncertain about the law of the Commonwealth of Virginia on this point, and there is no reason to apply the ends of justice exception here.

[12] Appellant also claims that he abandoned the intent to abduct once he discovered that C.S. was not Sydnor. Although appellant did decide not to force C.S. into the truck at that point, appellant had attempted to abduct him when he pointed the gun at him and told him to get into the truck. The fact that appellant later abandoned his intention to abduct C.S. only after C.S. refused to get into appellant's truck did not absolve appellant of his earlier actions and intention. Appellant admitted at trial that he intended to abduct the person that he thought was Sydnor, although he claimed he did not use a firearm when he accosted C.S. in the parking lot beside the church.

to support the verdict and to permit the verdict to stand." Snyder v. Commonwealth, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961).

Appellant's argument here essentially restates his first question presented. He simply contends that he had a right to seize Sydnor, so he had no intention to commit "abduction" when he stopped his truck behind the car in the parking lot, got out, and pointed a gun at the man that he thought was Sydnor. However, as appellant had no common law right to forcibly take Sydnor from Virginia and return him to North Carolina, his mistake of fact is irrelevant here. Whether appellant pointed a gun at Sydnor or someone else, he had no legal justification for his attempt to abduct that person from the parking lot beside the church in Mecklenburg County, Virginia. C.S.'s testimony at trial presented sufficient, credible evidence for the factfinder to reasonably conclude beyond a reasonable doubt that appellant specifically intended to abduct him from the parking lot. See Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (en banc) (explaining that intent can be proven by a defendant's actions). Code § 18.2-47 criminalizes the abduction of "any person," without exceptions for mistaken identity. Cf. Taylor v. Commonwealth, 260 Va. 683, 689-90, 537 S.E.2d 592, 595-96 (2000) (explaining that a father and his girlfriend cannot forcibly take his illegitimate child, as the statute criminalizes the abduction of "any person" and the father did not have a legal excuse for the abduction). We find that the trial court here did not err in finding appellant guilty.

To the extent that appellant claims he did not intend to abduct C.S., but only intended to abduct Sydnor, his argument still fails to prove that the trial court erred. Appellant still intended to commit an abduction, which is sufficient to convict him of the attempt to abduct C.S.

### III. CONCLUSION

The General Assembly has enacted statutes specifically regulating the licensing and practice of bail bondsmen and bail enforcement agents, abrogating any common law authority

- 15 -

that in the past may have permitted out-of-state bail bondsmen to enter Virginia and forcibly take a bailee back to another state.  As a result, appellant had no legal justification for his attempt here to abduct C.S. from the parking lot beside the church.  Furthermore, the evidence clearly supports the factfinder's conclusion that appellant intended to abduct the victim.  Given the trial court did not err in convicting appellant of attempted abduction, we also find no reason to overturn his conviction for use of a firearm in the commission of a felony.  Therefore, we affirm appellant's convictions for attempted abduction and use of a firearm in the commission of that felony.

Affirmed.