Present: Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ., and Carrico and Koontz, S.JJ.

CLIFTON L. COLLINS

OPINION BY
v.  Record No. 110067    SENIOR JUSTICE HARRY L. CARRICO
                              January 13, 2012
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we decide whether a bail bondsman licensed in another state but not in Virginia has the authority to enter Virginia and apprehend a fugitive bailee.  In a bench trial in the Circuit Court of Mecklenburg County, the defendant, Clifton L. Collins, was convicted of attempted abduction pursuant to Code §§ 18.2-26 and 18.2-47 and use of a firearm in the commission of a felony pursuant to Code § 18.2-53.1.  The circuit court sentenced Collins to incarceration for a term of five years on the attempted abduction charge, all suspended, and to the mandatory term of three years' incarceration on the weapons charge.

Collins appealed his convictions to the Court of Appeals of Virginia. In a published opinion, the Court of Appeals affirmed Collins' convictions.  Collins v. Commonwealth, 57 Va. App. 355, 702 S.E.2d 267 (2010).  We awarded Collins this appeal to consider two assignments of error, as follows:

I.    The Court of Appeals erred as a matter of law in affirming the trial court's finding that an out of state licensed bail bondsman does not have legal authority to recover a fugitive from Virginia or to

temporarily deprive a person of his freedom whom he reasonably believes to be the fugitive.

II. The Court of Appeals erred in affirming the trial court's determination that Mr. Collins had the requisite specific intent required for attempted abduction when he, a lawfully licensed bondsman, believed the person he was detaining to be the fugitive and released the person immediately upon learning that the person was not the fugitive.

BACKGROUND

Collins was licensed as a bail bondsman in North Carolina, but not in Virginia. On October 3, 2006, one of Collins' agents posted bond in the amount of $10,000 for the release of James R. Sydnor, III, from custody in Wake County, North Carolina, pending his trial on an identity theft charge. Sydnor failed to appear in court on October 18, 2006, as required, and a motion was made to forfeit the $10,000 bond. The court issued a bond forfeiture notice stating that forfeiture would be set aside if the fugitive was "surrendered by a surety or bail agent to a sheriff of [North Carolina] as provided by law."

Collins learned that Sydnor would be in Virginia on March 29, 2007, to attend a funeral at a church in Mecklenburg County. Accompanied by his wife, his son, and bail agents from his office, Collins and his party drove in two vehicles to Mecklenburg County intending to recover Sydnor and return him to North Carolina. Collins had seen a "mug shot" of Sydnor but had

2

never seen him in person before travelling to Mecklenburg County.

Upon arrival in Mecklenburg County, Collins arranged to meet Steve Jones, a deputy sheriff of the county, in an effort to gain the sheriff department's assistance in apprehending Sydnor.  Jones advised Collins that "the Sheriff's office could not get involved."

Collins then drove to the parking lot of the church where the funeral service was just ending and saw a man he thought was Sydnor opening the trunk of a car.  The man was not Sydnor but a Deputy Chief of Police (Deputy Chief) from a city in Virginia who had come to the church to attend the funeral of his uncle. At the conclusion of the service, he went to the parking lot to retrieve his checkbook from the trunk of his car to help his relatives defray the cost of the funeral.

The Deputy Chief opened the trunk of his car and saw Collins approaching from a truck parked in a manner blocking his car.  Collins got out of his truck with a Glock pistol in his hand, pointed it at the Deputy Chief, and said, "I believe you see what it is mother****, you know what it is."  Thinking he was being robbed, the Deputy Chief said he did not have any money. Collins replied that "this ain't about money."  Collins grabbed the Deputy Chief by the shoulder and began pulling him toward the truck. The Deputy Chief was then confronted by

Collins' employee, who emerged from the truck armed with mace and a handgun.  The Deputy Chief also observed a third person, a woman, in the truck, but she took no part in the melee.

While pulling on the Deputy Chief to put him in the truck, Collins kept calling him "Jimmy" and cursing at him.[1]  The Deputy Chief said: "I'm not Jimmy.  I'm not getting in the truck." Collins asked the Deputy Chief for identification, and the Deputy Chief displayed his driver's license.  Collins told the Deputy Chief that he was a bondsman and that "Jimmy" owed him $20,000.  He showed the Deputy Chief some sort of badge but refused to give him any other identification.  Collins and his employee then got in the truck and drove away.  The Deputy Chief called 911 and reported that someone had just pointed a gun at him in the church parking lot.

A Mecklenburg County grand jury returned indictments against Collins for attempted abduction and use of a firearm in the commission of attempted abduction.  At trial, Collins claimed that he remained in his vehicle during his encounter with the Deputy Chief, that he was alone in the vehicle, that he did not have a firearm at the time of the episode, and that he had not referred to the Deputy Chief as "Jimmy."  The trial

---

[1] Sydnor's first name was "James."  He and the Deputy Chief were cousins, and the Deputy Chief admitted at trial that they slightly resembled each other.

4

judge told Collins to his face that he found his testimony "unbelievable."

ANALYSIS

Attempted Abduction

Code § 18.2-47(A), pursuant to which Collins was convicted of attempted abduction, provides as follows:

> Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of "abduction."

Collins argues that, as a bail bondsman licensed in North Carolina, he had a common law right with wide reaching arrest authority allowing him to enter another state for the purpose of apprehending a fugitive, even though he is not licensed in the other state. This authority, Collins maintains, gave him the "legal justification or excuse," pursuant to Code § 18.2-47, for the seizure of a fugitive bailee.

We will assume, without deciding, that the common law previously authorized an out-of-state bondsman to enter this Commonwealth and apprehend a fugitive bailee without becoming licensed in Virginia. We must determine, therefore, whether anything has occurred to change the common law rule. Since "a decision to abrogate [a] longstanding common law principle is the proper function of the legislature, not the courts,"

5

*Robinson v. Matt Mary Moran, Inc.*, 259 Va. 412, 417-18, 525 S.E.2d 559, 562 (2000), we will confine our search to legislative changes.  And because we must interpret and apply any statutory changes, we are presented with a pure question of law, which we will review de novo.  *Gilliam v. McGrady*, 279 Va. 703, 708, 691 S.E.2d 797, 799 (2010).  Established principles of law will guide us in that review.

Code § 1-200 provides as follows:

> The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly.

In *Herndon v. St. Mary's Hospital*, 266 Va. 472, 476, 587 S.E.2d 567, 569 (2003), we stated as follows:

> [A] statutory provision will not be held to change the common law unless the legislative intent to do so is plainly manifested.  Therefore, a statutory change in the common law will be recognized only in that which is expressly stated in the words of the statute or is necessarily implied by its language.

(Citations omitted).

At its 2002 session, the General Assembly adopted House Joint Resolution No. 201, which decried the lack of statewide standards and procedures for the certification and regulation of bail bondsmen.[2]  The resolution directed the Virginia State Crime Commission "to study certain issues pertaining to bail bondsmen

---

[2] Previously, circuit courts and the State Corporation Commission authorized persons to act as bail bondsmen.

[and] bounty hunters" and to "complete its work by November 30, 2002," in time for submission to the 2003 session of the General Assembly.

In its final report, the State Crime Commission made twenty recommendations concerning bail bondsmen and twenty for bounty hunters. See Virginia State Crime Comm'n, Report on Study of Bail Bondsmen & Bounty Hunters, House Doc. No. 13, at 18-23 (2004). In response, the General Assembly adopted Chapter 460 of the Acts of Assembly of 2004, which created Article 11 of Chapter 1, Title 9.1 of the Code of Virginia, relating to bail bondsmen, comprised of Sections 9.1-185 to 9.1-185.18 at the time of Collins' journey into Virginia, and Article 12, relating to bail enforcement agents, comprised of Sections 9.1-186 to 9.1-186.13.

Code § 9.1-185.2 gave the Criminal Justice Services Board (the Board) full regulatory authority and oversight of property and surety bail bondsmen and Code § 9.1-186.2 gave the Board the same authority and oversight of bail enforcement agents, or "bounty hunters."

With respect to both groups, the Board is required to adopt regulations that are "necessary to ensure respectable, responsible, safe and effective bail bonding [and bail enforcement] within the Commonwealth." Code §§ 9.1-185.2 and 9.1-186.2(C). Detailed provisions are specified for licensure,

7

professional conduct, discipline, solicitation of business, training in and use of firearms, types of clothing and identification, documentation and record keeping, recovery of bailees, and penalties for certain persons who violate any statute or Board regulation.

Collins argues that none of these statutory changes "specifically take away the right of an out of state bondsman [to apprehend] his bailee in Virginia." We disagree with Collins.

Code § 9.1-185 defines a bondsman as "any person who is licensed by the Department [of Criminal Justice Services] who engages in the business of bail bonding and is thereby authorized to conduct business in all courts of the Commonwealth." Code § 9.1-186 defines a bail enforcement agent or "bounty hunter" as "any individual engaged in bail recovery." Code §§ 9.1-185.18 and 9.1-186.13 provide that any individual who, without a valid license issued by the Department of Criminal Justice Services, engages in bail bonding or bail recovery in the Commonwealth is guilty of a Class 1 misdemeanor. And Code §§ 9.1-185.7(A) and 9.1-186.7(A), styled "Licensure of nonresidents," provide that all nonresident transfers and applicants for a bail bondsman license or a bail enforcement agent license shall satisfy all licensing requirements for residents of the Commonwealth.

We cannot perceive how the General Assembly could have more plainly manifested its intent to abrogate the long standing common law rule allowing out-of-state bail bondsmen and bounty hunters to enter Virginia to apprehend fugitive bailees. It is inconceivable that the General Assembly intended to impose such strict requirements upon in-state bail bondsmen and bounty hunters as those enacted as a result of the Crime Commission report, yet intended to leave out-of-staters with the unfettered right to enter Virginia and apprehend fugitive bailees without being subject to regulation. Such an intent would be completely at odds with the legislatively expressed goal of ensuring "respectable, responsible, safe and effective bail bonding [and bond enforcement] within the Commonwealth." Code §§ 9.1-185.2 and 9.1-186.2(C). We will not attribute such an intent to the General Assembly and instead will hold that it plainly manifested its intent to abrogate the common law rule.

Requisite Specific Intent

Collins argues that he reasonably believed it was Sydnor he attempted to load into his truck and only a mistake of fact caused him to attempt to capture and transport the Deputy Chief. There was not sufficient evidence, Collins maintains, to establish the specific intent, or to prove the mens rea, necessary to support a conviction of attempted abduction.

At this point, however, Collins' mistake of fact is irrelevant.[3] Without the common law rule to protect him, he had no privilege to use force to detain anyone, including Sydnor, had he been on the scene instead of the Deputy Chief. Moreover, a person's intent may be proven by his actions. Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994). The evidence of Collins' use of foul language, his pointing of a deadly weapon at the Deputy Chief, his allowance of an employee to confront the Deputy Chief with mace and a handgun, and his use of physical force in pulling the Deputy Chief toward the truck all prove beyond a reasonable doubt that, "without legal justification or excuse, [he] seize[d] . . . another person with the intent to deprive such other person of his personal liberty." Code § 18.2-47.

In a final argument, Collins contends that he abandoned any intent to abduct as soon as he learned it was the Deputy Chief and not Sydnor he was pulling on to get him into the truck and that this supports his argument concerning the lack of specific intent. But the abandonment came too late. At that point, the attempt was complete. "[I]f a man resolves on a criminal enterprise, and proceeds so far in it that his act amounts to an

---

[3] We have expressly declined to adopt a " 'hybrid legal impossibility' " defense in which "a mistake of fact about the legal status of some necessary element of [a] crime nullifies a crime of attempt." Hix v. Commonwealth, 270 Va. 335, 342 n.5, 619 S.E.2d 80, 84 n.5 (2005).

10

indictable attempt, it does not cease to be such, though he voluntarily abandons the evil purpose." Howard v. Commonwealth, 207 Va. 222, 229, 148 S.E.2d 800, 805 (1966) (quoting Glover v. Commonwealth, 86 Va. 382, 386, 10 S.E. 420, 422 (1889)).

## CONCLUSION

For the reasons assigned, we will affirm the judgment of the Court of Appeals of Virginia.

Affirmed.

11